**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 98-3287

ANITA L. GUIDRY,

    Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 97-CR-10162-MLB)**

---

Debra L. Barnett (Jackie N. Williams, United States Attorney, with her on the brief), Assistant United States Attorney, Wichita, Kansas, for Plaintiff-Appellee.

Daniel E. Monnat of Monnat & Spurrier, Chartered, Wichita, Kansas, for Defendant-Appellant.

---

Before **BRORBY, HENRY** and **LUCERO**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

    A jury found Appellant Anita L. Guidry guilty of three counts of knowingly

and willfully filing a false tax return in violation of 26 U.S.C. § 7206(1).  The

district court denied Mrs. Guidry's Motion for Judgment of Acquittal as to the three counts and sentenced her to sixty months imprisonment. Mrs. Guidry now appeals her conviction and sentence, challenging a search warrant as overbroad, jury instructions, the sufficiency of the evidence, and various applications of the sentencing guidelines. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm in part, reverse in part, and remand for resentencing.

## BACKGROUND

Anita L. Guidry was the architect of an embezzlement scheme that allowed her to line her pockets with approximately $3 million belonging to her employer, Wichita Sheet Metal.[1] While the embezzlement scheme itself is not directly in issue here, understanding the facts surrounding the scheme is a necessary predicate to resolving the issues before us. Accordingly, we begin with a cursory

---

[1] Mrs. Guidry used her stolen money to make sure she had plenty of pockets to line. During the years of her embezzlement, Mrs. Guidry spent over $1.2 million on clothing from one retailer alone – GM Clotheshorse. Her employer, Wichita Sheet Metal, eventually took possession of 1300 dresses, 182 pairs of shoes, 164 hats, 40 belts, 27 purses, two fur coats, and boxes of jewelry that included over 400 pairs of earings, all of which Mrs. Guidry had kept in several rented storage units. Mrs. Guidry's former employers certainly have the inventory, if not the experience, to open their own boutique should the sheet metal business turn sour.

examination of Mrs. Guidry's background and her embezzlement.

Mrs. Guidry graduated from Wichita State University with a Bachelor's Degree in Business Administration. Her resume lists her major area of study as accounting, and she listed her occupation as accountant on several tax returns filed with the Internal Revenue Service. Wichita Sheet Metal hired Mrs. Guidry as an assistant to the controller of the company in 1986, and she subsequently became the controller in 1987, a position she held until she resigned in 1997. As controller, Mrs. Guidry not only supervised nearly every employee in the office, but she was an authorized signatory on the company checking account.

Mrs. Guidry's embezzlement scheme consisted of submitting checks, already signed by her and made payable to the company's bank, to Freda Moore or John Griffit, owners of Wichita Sheet Metal, for their signature. Mrs. Guidry wrote the checks in $10,000 or $9,000 increments, and she told Mrs. Moore and Mr. Griffit the checks were for federal tax payments. After collecting the proper signature, Mrs. Guidry cashed the checks at the company bank and pocketed the cash. Finally, to prevent discovery of her scheme, Mrs. Guidry altered the company's books to make it appear the money she had taken for personal pleasures was actually used to purchase inventory for the company. This created

a discrepancy between the actual inventory and the inventory reflected on the company's books. The company's owners eventually asked for a detailed audit of the discrepancy, which ultimately led to the discovery of Mrs. Guidry's embezzlement.

Mrs. Guidry had financial responsibilities at home in addition to those at work. As the accountant in the family, Mrs. Guidry prepared the joint federal tax returns she filed on behalf of herself and her husband for 1993, 1994, and 1995. According to Mrs. Guidry's husband, these returns were prepared elaborately, which fact is buttressed by the returns themselves. The Guidrys painstakingly itemized their deductions, taking charitable deductions of $7,513 in 1993, $11,692 in 1994, and $13,102 in 1995. Not surprisingly, however, none of the returns reported the embezzled income. In 1993, Mrs. Guidry cashed forty checks through her embezzlement scheme for a total amount of $400,000. The Guidrys declared a total income, combined husband and wife, of $82,817 on their federal income tax return in 1993. In 1994, fifty-nine checks were cashed for a total of $563,000, and the Guidrys declared a total income of $88,547. In 1995, it was sixty-four checks cashed for $576,000, compared to a total declared income of $90,883.

While investigating Mrs. Guidry's embezzlement, Special Agent Martin McCormick of the Internal Revenue Service participated in the execution of a search warrant at the Guidry home. While searching for bank records, Special Agent McCormick opened a drawer in a file cabinet marked "taxes" and observed "tax booklets identical to those that are mailed to everyone by the Internal Revenue Service every year at the first of the year." The 1993 tax booklet the Internal Revenue Service provided with the Individual Income Tax Return listed embezzled income as taxable income that must be reported. The 1994 and 1995 tax booklets did not specifically contain this language, but instead referenced a publication the taxpayer could request which did specifically state embezzled income must be reported as taxable income.

## DISCUSSION

### I. The Warrant

The search warrant executed at Mrs. Guidry's home authorized officers to seize "[a]ny and all bank records, including but not limited to checks, statements, deposits, or investment records, or records of bank or money transfers." Mrs. Guidry contends the warrant suffered from three deficiencies: (1) the warrant failed to provide any meaningful limitations on items to be seized; (2) the warrant simply authorized the seizure of all files, regardless of their relevance to a

specified crime; and (3) the warrant authorized the search and seizure of evidence not supported by probable cause, meaning the scope of the warrant exceeded the probable cause supporting it.

"When reviewing a district court's denial of a motion to suppress, we consider the evidence in the light most favorable to the government, and accept the court's findings of fact unless they are 'clearly erroneous.'" *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir.), *cert. denied*, 119 S. Ct. 437 (1998). However, "[w]e review de novo whether the warrant was overbroad or insufficiently particular under the Fourth Amendment." *United States v. Hargus*, 128 F.3d 1358, 1362 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 1526 (1998). The Fourth Amendment requires warrants "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A sufficiently particular warrant "allows the searcher to reasonably ascertain and identify the things authorized to be seized," leaving "nothing to the officer's discretion as to what is to be seized, so that the officer is prevented from generally rummaging through a person's belongings." *Hargus*, 128 F.3d at 1362. A warrant describing "items to be seized in broad and generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'" *United States v. Leary*, 846 F.2d 592, 600

(10th Cir. 1988) (quoting *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985)); *see also Hargus*, 128 F.3d at 1363.

The district court focused on the affidavit in support of the warrant to examine the context in which the warrant was requested. The court pointed out the affidavit detailed what was known about the embezzlement scheme at the time, including information about the closing of several bank accounts in Kansas proximate to the time the scheme was discovered and the subsequent opening of other accounts in Oklahoma, and the inability of agents to find either the vast majority of the money Mrs. Guidry had embezzled, or all the money she withdrew from her Kansas banks. Considering the type and extent of Mrs. Guidry's criminal activity, the district court reasoned the warrant was as specific as circumstances allowed: "Absent omniscience, the government could provide no greater specificity." We find this a much closer call, but need not address the Fourth Amendment issue because we exercise our discretion to turn "immediately to a consideration of the officers' good faith" as allowed under *United States v. Leon*, 468 U.S. 897, 925 (1984).

"Even if the warrant was not specific enough, [a] court should not suppress the evidence [if] the agents seized it in objectively reasonable reliance on the

warrant." *United States v. Robertson*, 21 F.3d 1030, 1034 (10th Cir. 1994) (citing *Leon*, 468 U.S. at 920-22). "Our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances ... may be considered." *Leon*, 468 U.S. at 922 n.23. Given the circumstances surrounding the warrant at issue here, we hold the officers acted on a good-faith belief the warrant was sufficiently particular in regard to the items to be seized.

The government executed this warrant nearly two months after the initial indictment was filed against Mrs. Guidry. The initial indictment charged Mrs. Guidry with violations of 18 U.S.C. §§ 1956 (money laundering) and 1344 (bank fraud). Special Agent McCormack was intimately involved in the investigation of Mrs. Guidry's embezzlement prior to the execution of the warrant at Mrs. Guidry's home. By the time he executed the warrant, Special Agent McCormack had analyzed numerous bank records connected to the case, served federal grand jury subpoenas on two banks, and served seizure warrants at three banks. The affidavit in support of the warrant limited the search to bank records related to violations of 18 U.S.C. §§ 982 (criminal forfeiture) and 1957 (engaging in monetary transactions in property derived from specified unlawful activity), in

addition to the code sections listed in the initial indictment.[2] While Special Agent McCormack did not personally prepare the affidavit, he did help collect the information used by the preparing officer.

We have previously stated "the knowledge of the executing officer can be considered in determining the sufficiency of the description [of a place to be searched]." *United States v. Occhipinti*, 998 F.2d 791, 799 (10th Cir. 1993). We have also applied the good-faith exception when the officer who swore out the affidavit helped execute the warrant. *See United States v. Simpson*, 152 F.3d 1241, 1248 (10th Cir. 1998). We find these cases instructive, and hold Special Agent McCormack acted in good-faith reliance on the warrant because he was so intimately involved in the investigation prior to the execution of the warrant, and the preparation of the affidavit in support of the warrant. This level of involvement in the case gave him obvious knowledge of the crimes that were the subject of the investigation. [3]

---

[2] The particularity of an affidavit can cure an overbroad warrant when the affidavit is both referenced in the warrant and physically attached to the warrant. *See Leary*, 846 F.2d at 603. The record here is insufficient to make such a determination, thus the affidavit cannot cure any possible overbreadth in the warrant.

[3] Our holding is further bolstered by the fact Special Agent McCormack did not actually seize the tax records and booklets he observed in Mrs. Guidry's home.

II.  The Jury Instructions

Mrs. Guidry next assigns error to the district court's jury instructions, claiming the instructions inadequately defined the term "willfully" as it pertains to the crime of filing a false tax return.  (Apt. Br. at 19-22.)  "We review de novo a timely challenge to a jury instruction to determine whether, considering the instructions as a whole, the jury was misled."  *United States v. Winchell*, 129 F.3d 1093, 1096 (10th Cir. 1997).  We will not reverse "unless we have 'substantial doubt that the jury was fairly guided.'"  *Id*. (quoting *United States v. Mullins*, 4 F.3d 898, 900 (10th Cir. 1993)).

The Supreme Court addressed the statutory definition of "willful" as it is applied in the tax code in *Cheek v. United States*, 498 U.S. 192 (1991).  The Court held its cases "conclusively establish that the standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.'"  *Id.* at 200-01 (quoting *United States v. Bishop*, 412 U.S. 346, 360 (1973)); *see also Winchell*, 129 F.3d at 1096.  The district court's instructions in the current case tracked the *Cheek* language almost verbatim:  "For the purpose of this instruction, the term 'wilfully' means to voluntarily and intentionally violate a known legal duty."  Mrs. Guidry requested an additional sentence at the end of

-10-

the instruction stating "[n]egligent conduct is not sufficient to constitute willfulness." Mrs. Guidry argues she was entitled to the requested language. As support for her position, she contends we have endorsed such an instruction in *Winchell*, and the additional language is crucial for a proper definition of the willfulness element. This argument has no merit. First, Mrs. Guidry misconstrues our holding in *Winchell*. In *Winchell*, we held the defendant in a § 7206(1) case was not entitled to a separate instruction on "specific intent" because the "willfulness" instruction given was adequate standing alone.[4] *Winchell*, 129 F.3d at 1096-97. Concluding the language at issue in *Winchell* was adequate is a far cry from deeming it necessary. Second, nothing in *Cheek* requires an additional reference to negligent conduct. The instructions in this case did not mislead the jury. To the contrary, the instructions clearly stated the correct legal standard.

III.  Sufficiency of the Evidence

Mrs. Guidry next complains the evidence at trial was insufficient to sustain the jury's verdict. This argument presents a high hurdle, and one Mrs. Guidry

_____

[4] The instruction in *Winchell*, which was accepted by both parties, stated: "To act 'willfully' means to voluntarily and intentionally violate a known legal duty .... Negligent conduct is not sufficient to constitute willfulness." *Winchell*, 129 F.3d at 1096 (quotation marks and citation omitted).

fails to surmount.

> "[I]n reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de novo and ask only whether, taking the evidence – both direct and circumstantial, together with reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."

*United States v. Beers*, 189 F.3d 1297, 1301(10th Cir. 1999) (quoting *United States v. Voss*, 82 F.3d 1521, 1524-25 (10th Cir.), *cert. denied*, 519 U.S. 889 (1996)).  We will not second-guess the jury's credibility determinations or conclusions concerning the weight of the evidence presented.  *Id.*

Mrs. Guidry contends the "only" evidence supporting willfulness consists of her background and experience in accounting, the testimony to the effect Internal Revenue Service documents listed embezzled income as taxable income, and Agent McCormick's testimony he observed some Internal Revenue Service tax booklets in Mrs. Guidry's files at her home.  Seeing a lack of evidence, Mrs. Guidry then goes on to cite our decision in *McCarty v. United States*, 409 F.2d 793 (10th Cir.), *cert. denied*, 396 U.S. 836 (1969), for the proposition that "willfulness cannot be inferred from a mere understatement of income." *Id.* at 795 (citing *Spies v. United States*, 317 U.S. 492 (1943)).  This analysis suffers from two fatal flaws:  it fails to view all the evidence in the light most favorable

-12-

to the Government, and it provides an incomplete view of the Supreme Court's guidance in *Spies*.

While it is well established willfulness cannot be inferred solely from an understatement of income, willfulness can be inferred from

> making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."

*Spies*, 317 U.S. at 499; *see also United States v. Samara*, 643 F.2d 701, 704 (10th Cir. 1981). This conduct can be used to prove willfulness "even though the conduct may also serve other purposes such as concealment of other crime." *Spies*, 317 U.S. at 499. The jury heard sufficient evidence to support its finding of willfulness in this case.

First, the jury heard evidence of Mrs. Guidry's expertise in accounting via her degree in business and her work experience as the controller of a company. The evidence showed Mrs. Guidry prepared the family taxes, and did so "elaborately" according to her husband. An investigator observed tax booklets from unknown years in Mrs. Guidry's files, and the jury learned the tax booklets specific to the years in question in this case either stated embezzled income

should be reported, or referenced a second Internal Revenue Service document where taxpayers might receive that information. The evidence also showed: an ever-burgeoning disparity between the Guidrys' reported income and their actual income as complemented by the embezzlement scheme; the embezzled cash was used to purchase goods, making the money more difficult to detect; the Guidrys took significant charitable deductions on their taxes while not reporting the embezzled income; and the money was embezzled in increments of $9,000 or $10,000. Mrs. Guidry argues the jury should not have been allowed to take evidence of the embezzlement scheme itself into account, but such an argument defies logic.

Concealment of income can have more than one purpose. Such activity can show a desire to conceal the theft from the employer, and it can tend to show a purposeful attempt to conceal such income from the Internal Revenue Service. In addition, an inference of willfulness can be supported by a "consistent pattern of underreporting large amounts of income." *Holland v. United States*, 348 U.S. 121, 139 (1954); *see also United States v. Frank*, 437 F.2d 452 (9th Cir.), *cert. denied*, 402 U.S. 974 (1971). "Criminal willfulness can be inferred when a defendant does not supply her tax preparer with evidence of substantial items of income." *United States v. Stokes*, 998 F.2d 279, 281 (5th Cir. 1993). In *Stokes*,

the Ninth Circuit upheld a conviction under § 7206(1) when the defendant did not disclose illegal income to her tax preparer. It makes little sense to apply one standard to a person who withholds information from a tax preparer, and another standard to a self-preparer who withholds similar information from the Internal Revenue Service directly. The jury was free to conclude Mrs. Guidry had accounting expertise, that information stating embezzled income was to be reported as income on the tax return was available to her, and that she would have availed herself of the information. The jury was also free to examine the way the embezzlement scheme was designed to conceal assets, and infer Mrs. Guidry's intent was to avoid paying a known tax liability. As in *Spies*, Mrs. Guidry "claims other motives animated [her] in these matters. We intimate no opinion. Such inferences are for the jury." *Spies*, 317 U.S. at 500. Our holding is limited to the unique facts of this case. Given the combination of Mrs. Guidry's background and training, the details of her embezzlement scheme and attempts to conceal her income, and the testimony concerning the presence and contents of federal tax booklets, the evidence was sufficient to support the jury's verdict in this case.

IV. Application of the Sentencing Guidelines

Finally, Mrs. Guidry argues the district court erred in imposing sentencing

enhancements for sophisticated means and abuse of position of trust, and improperly considered race when denying a downward departure. We review the district court's legal interpretation of the sentencing guidelines de novo and the district court's factual findings for clear error. *United States v. Rice*, 52 F.3d 843, 848-49 (10th Cir. 1995). We conclude the district court's imposition of the enhancement for abuse of position of trust was clearly erroneous, and remand for resentencing.

A. Sophisticated Means Enhancement

United States Sentencing Guideline § 2T1.1 provides for a two-level sentence enhancement when "sophisticated means were used to impede discovery of the existence or extent of the offense." U.S.S.G. § 2T1.1(b)(2). The commentary to the guideline defines "sophisticated means" as "conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." U.S.S.G. § 2T1.1, cmt. n.4. The district court imposed this enhancement after explicitly finding this was not a routine case. We agree.

Mrs. Guidry's is not a case of simply claiming to have paid withholding taxes not paid, *see Rice*, 52 F.3d at 849, or of not disclosing income to one's accountant, *see Stokes*, 998 F.2d at 282. Mrs. Guidry's scheme allowed her to do

more than conceal her embezzlement from her employers – it allowed her to conceal the income from the Internal Revenue Service and made it difficult to determine the extent of the tax loss suffered by the federal government. The checks Mrs. Guidry used to embezzle funds were made payable to the bank, not Mrs. Guidry. Mrs. Guidry converted the checks to cash, which is harder to trace, then spent the vast majority of the money on personal items, again making it difficult for the Internal Revenue Service to discover the extent of the crime. She deposited only a fraction of the embezzled money in the bank. Most damaging for Mrs. Guidry, she never took more than $10,000 in one day. The district court heard testimony at the sentencing hearing that banks are required to file documents known as Currency Transaction Reports for transactions exceeding $10,000. These reports are filed with the Internal Revenue Service, and are not, as a matter of course, made available to the company or individual in whose name the transaction occurred. Structuring the transactions to avoid a Currency Transaction Report, therefore, served the main purpose of shielding the transaction from the Internal Revenue Service. In addition, while Mrs. Guidry may not have used a sham corporation, or offshore bank accounts, to hide her bounty from the Internal Revenue Service, stocking multiple storage units with over a million dollars in clothes and costume jewelry had a similar effect – concealment of the embezzled cash. Clearly, her meticulous scheme was

designed, at least in part, to conceal the existence and extent of her failure to file a truthful tax return, and the district court did not clearly err in finding she did so in a sophisticated manner.

B. Abuse of Position of Trust Enhancement

The district court also imposed an enhancement pursuant to U.S.S.G. § 3B1.3, which provides, in pertinent part: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels." U.S.S.G. § 3B1.3. Before imposing this enhancement, a district court must find two things: (1) the defendant possessed a position of trust; and (2) the defendant abused the position to significantly facilitate the commission or concealment of the offense. *United States v. Burt*, 134 F.3d 997, 998-99 (10th Cir. 1998). Mrs. Guidry focuses on the latter step, arguing the imposition of this enhancement was clearly erroneous because her obvious abuse of her position of trust at Wichita Sheet Metal did not significantly facilitate the commission or concealment of her offense. While this particular argument is unconvincing, we agree the application of this enhancement is inappropriate here

because Mrs. Guidry did not occupy a position of trust vis-à-vis the government,[5] thereby failing the first step of the *Burt* analysis.

The district court employed the two-step *Burt* analysis and made the following findings:  "The first element is really not contested....  [T]he evidence is overwhelming that the Defendant occupied a position of trust at Wichita Sheet Metal."  As far as the second element, the court emphasized the control Mrs. Guidry exercised over the payment of wages and the finances of the company, and found the evidence showed

> the people who ran Wichita Sheet Metal trusted her explicitly and really never questioned her about anything she was doing in her capacity as controller, [her position] allowed her to systematically take more than $2 million out of that company and put it into her pocket and not report it in any way on the books of the company and particularly on records that would go to the Internal Revenue Service as a matter of course from the business....  And that allowed her to conceal the offense from the [Internal Revenue Service].

The district court's approach to the second prong of *Burt* is fairly persuasive.  U.S.S.G. § 3B1.3 allows enhancement when a defendant's abuse of a

---

[5]  "'When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'"  *United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

position of trust significantly facilitates "the commission or concealment of the offense." U.S.S.G. § 3B1.3. Sentencing courts may consider conduct outside the offense of conviction when imposing the abuse of a position of trust enhancement: "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), ... and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G. Ch. 3, Pt. B, intro. cmt. Section 1B1.3 in turn states enhancements shall be based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Given the facts of this case, the district court may have been correct in finding Mrs. Guidry's embezzlement activity was relevant conduct, committed to avoid detection of her false income tax returns. However, to reach the second prong of *Burt* a district court must first find the defendant occupied a position of trust, and our case law clearly states the position of trust must be found in relation to the victim of the offense: "The question of whether an individual occupied a position of trust is evaluated from the victim's perspective." *United States v. Trammell*, 133 F.3d 1343, 1355 (10th Cir. 1998) (citing *United States v. Queen*, 4 F.3d 925, 929 (10th

Cir. 1993), *cert. denied*, 510 U.S. 1182 (1994)); *see also United States v. Brunson*, 54 F.3d 673, 677 (10th Cir.), *cert. denied*, 516 U.S. 951 (1995).

"The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996). We have applied § 3B1.3 in two types of cases: "The first is where the defendant steals from his employer, using his position in the company to facilitate the offense," and the "second is where a 'fiduciary or personal trust relationship exists' with other entities [not the employer], and the defendant takes advantage of the relationship to perpetrate or conceal the offense." *Id.* (quoting *Brunson*, 54 F.3d at 677). Mrs. Guidry's conduct in filing false income tax returns falls into neither category. We must vacate the portion of the sentence imposed due to the abuse of a position of trust enhancement and remand for resentencing because Mrs. Guidry did not occupy a position of trust vis-à-vis the government, the victim in this case.[6]

---

[6] The Circuits are split on the relationship a position of trust must have to the victim of the offense for the purpose of enhancement. *Compare United States v. Barakat*, 130 F.3d 1448, 1454-56 (11th Cir. 1997) (holding defendant did not use his particular position of trust, which allowed him access to illegal unreported income, to conceal the offense of conviction – tax evasion), *United States v. Jolly*, 102 F.3d 46, 48-50 (2d Cir. 1996) ("the abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant

C.  Denial of Downward Departure

At sentencing, Mrs. Guidry moved for a downward departure, citing as support her years of service to groups and individuals in the black community. The district court denied Mrs. Guidry's motion.  In considering the departure, the court stated it was

> balancing her community service with what she did in this case; and in my opinion her community service does not justify a downward departure considering the evidence in the case regarding the nature and extent of her wrongdoing....  This is a case where the Defendant set out and did steal millions of dollars from her employer and would be doing so today if she had not been caught.
>
> Now, she might also be out doing good works, Ladies and

---

by the victim" (citing *United States v. Broderson*, 67 F.3d 452, 455-56 (2d Cir. 1995) (stating without a nexus between the victim and the position of trust, anyone commanded by statute to make an accurate report to the government would be subject to the enhancement, including all taxpayers who file false tax returns)), *and United States v. Moore*, 29 F.3d 175, 179-80 (4th Cir. 1994) (reversing § 3B1.3 enhancement when defendants held positions of trust in relation to entities other than the victim of their fraud scheme), *with United States v. Cianci*, 154 F.3d 106, 110-13 (3d Cir. 1998) (holding § 3B1.3 enhancement appropriate in tax evasion case when defendant abused position of trust with his company to embezzle unreported income), *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997) (holding the government is not necessarily the only victim in a tax evasion scheme, and the enhancement can apply if any identifiable victim of the overall scheme to evade taxes put the defendant in a position of trust), *and United States v. Duran*, 15 F.3d 131, 132-34 (9th Cir. 1994) (per curiam) (sheriff's use of position to embezzle money and his subsequent structuring of financial transactions to avoid reporting requirements were part of a common scheme or plan under U.S.S.G. § 1B1.3(a)(2), and § 3B1.3 enhancement was appropriate when jury convicted defendant of structuring offense, but failed to reach a verdict on underlying theft charge).

Gentlemen, in the community; but she also would be a thief and a crook ....

The court also cited the "terrible disservice" Mrs. Guidry's criminal activity had visited on her husband and daughter as a factor to take into consideration in determining whether or not to depart. The court then added the following remarks:

> So I suppose I ought to say one more thing in view of the evidence today. I have sentenced many many people in this court from the black community here in Wichita. Some of you know that. And probably all of you know it to one extent or another. They are people, some of them, many of them, have had no – they don't have parents ... who cared for [them]. They had no significant upbringing of any kind. They commit violent crimes. They're involved with drugs. Things that you all, I think rightly so, are trying to stop. Now, what kind of message does it send to the people that you all are concerned about if I overlook, as you all have done for your own reasons, what Mrs. Guidry – the crimes Mrs. Guidry has committed and consider only her community service? It says – I think it would say – it would send a message, perhaps, to people, maybe the wrong message, but it might send the message that if you're active in the community that you can steal a couple of million dollars from your employer and then come in and ask the judge to give you a break because you were active in the community. And I don't believe that's the message to be sent.

Just prior to imposing sentence, the court expressed its dislike for the sentencing guidelines, but stated: "I do my best to follow [the guidelines] because I think that's my duty ... because I think that the appropriate way for a federal judge to conduct himself or herself is to follow the guidelines whenever possible rather than find ways to get around them."

Under normal circumstances, we lack jurisdiction to review a sentencing court's discretionary denial of a downward departure. *United States v. Neary*, 183 F.3d 1196, 1197 (10th Cir. 1999); *United States v. Castillo*, 140 F.3d 874, 887 (10th Cir. 1998) (citing *United States v. Rodriguez*, 30 F.3d 1318, 1319 (10th Cir. 1994)). However, we retain the ability to review a refusal to depart when the denial is based on an illegal factor, or an incorrect application of the Guidelines. *See Castillo*, 140 F.3d at 888; *Rodriguez*, 30 F.3d at 1319; *United States v. Garcia*, 919 F.2d 1478, 1479, 1481 (10th Cir. 1990); 18 U.S.C. § 3742(a)(1), (a)(2), and (e). Certain factors – "race, sex, national origin, creed, religion, and socio-economic status" – may never be bases for departure. *See Koon v. United States*, 518 U.S. 81, 93 (1996); U.S.S.G. § 5H1.10. A sentencing decision based on race qualifies as both a violation of law and an incorrect application of the Guidelines, and therefore can be reviewed by this court. *Neary*, 183 F.3d at 1198; *United States v. Onwuemene*, 933 F.2d 650, 651 (8th Cir. 1991); *Garcia*, 919 F.2d at 1480.

Mrs. Guidry argues the district court's reference to the "black community" constituted consideration of her race for sentencing purposes. We disagree. While the district court's reference to race was most unfortunate and inappropriate, we do not read the judge's comments as taking any action or

refusing action relating to Mrs. Guidry based on race. Rather, the court was rejecting, inartfully, her argument that her service to the minority community somehow atoned for her crimes. Simply put, the court was responding to a chorus of Mrs. Guidry's supporters with a reference to the fact that the same community Mrs. Guidry had served so ably had also been deeply damaged by her actions. Standing alone, the court's comments might suggest stereotyping and bias that would give us grave concern and require a remand. However, given the context of the sentencing hearing and the nature of the court's remarks taken in their entirety, we determine the district court did not consider Mrs. Guidry's race in its sentencing decision. *See generally United States v. Munoz*, 974 F.2d 493 (4th Cir. 1992). The district court did not base its sentencing decision on an illegal factor, or an incorrect application of the Guidelines, and therefore we lack jurisdiction to review its discretionary denial of the requested downward departure.

Accordingly, we **AFFIRM** in part, **VACATE** the portion of the sentence enhanced for abuse of a position of trust, and **REMAND** for resentencing.

98-3287, United States of America v. Anita L. Guidry

**LUCERO**, Circuit Judge, concurring in part, dissenting in part.

I join in the majority opinion with the exception of Section IV.C., as to which I dissent. Race is never relevant to sentencing determinations. U.S.S.G. § 5H1.10. There is no doubt in my mind that the trial court's comments on race uttered at Mrs. Guidry's sentencing were motivated by good intent. Nonetheless, it is impossible to overlook the fact that Mrs. Guidry's race played some role in the denial of the motion for downward departure. In making this sentencing decision, the trial court expressly and unequivocally sought to send a message—or not send the "wrong" message—to the African-American community of Wichita, a community to which Mrs. Guidry belonged. While it may be permissible to use a sentence to send a message to criminal groups, it is impermissible to use a sentence to send a message to racial groups. Cf. United States v. Munoz, 974 F.2d 493, 496 (4th Cir. 1992) ("[T]he connection between the group targeted for deterrence and the defendant must be the criminal conduct and not the defendant's national origin."). Similarly, while a sentencing court has discretion to disregard a defendant's benevolent activities, see U.S.S.G. § 5K2.0, it may not to do so for the explicit purpose of sending a message to the racial community that benefits from those activities.

Because U.S.S.G. § 5H1.10 prohibits the consideration of race in sentencing determinations, and because the sentencing court controverted that principle, I would reverse and remand for resentencing for this reason as well.