**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 3 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ERNEST GLENN AMBORT,

Defendant - Appellant.

No. 03-4243

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:98-CR-197-01-DB)**

---

Scott Keith Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, with him on the briefs), Salt Lake City, Utah, for Defendant - Appellant.

Brian Galle, Attorney (Alan Hechtkopf, Attorney, with him on the briefs), Tax Division, Department of Justice, Washington, D.C., for Plaintiff - Appellee.

---

Before **KELLY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

Defendant Ernest Glenn Ambort appeals his conviction and sentence following a jury trial on one count of conspiracy to defraud the United States by assisting in the preparation of false tax returns, in violation of 18 U.S.C. § 371, and sixty-nine counts of aiding and assisting in the preparation of false federal tax returns, in violation of 26 U.S.C. § 7206(2). We affirm.

## BACKGROUND

We take the following facts from one of our prior opinions in this case:[1]

The conspiracy count alleges that Defendants operated an organization known as "Association de Libertas" (ADL) that conducted "constitutional history seminars" throughout the United States. It further alleges that ADL leaders falsely told the seminar attendees that they were "nonresident aliens" exempt from most federal income taxes. For a fee of $1,500 to $1,600 for "forms training," ADL instructors taught the attendees how to complete an amended return form (Form 1040X) and/or a nonresident alien income tax return form (Form 1040NR), falsely claiming a refund for past years' taxes. In addition to the above fee, ADL also required one-third of any refund. To ensure payment, the mailing address of an ADL instructor or "escrow agent" appeared on the amended returns. The false return counts allege that the Defendants assisted in preparation of tax returns that were false and fraudulent as to a material matter, specifically classifying the taxpayers as nonresident

---

[1]Ambort and three co-defendants previously appealed an order of the district court denying their motion to dismiss the indictment. We dismissed the appeal for lack of jurisdiction. United States v. Ambort, 193 F.3d 1169 (10th Cir. 1999). He attempted another unsuccessful interlocutory appeal and request for mandamus relief. United States v. Ambort, Nos. 01-4077, 01-4078, 01-4079, 2002 WL 1647232 (10th Cir. July 24, 2002), cert. denied, 537 U.S. 1076 (2002).

aliens when the taxpayers were in fact residents of the United States subject to taxation and not entitled to the refunds claimed.

United States v. Ambort, 193 F.3d 1169, 1170-71 (10th Cir. 1999).

ADL participants could also pay $2500 to attend an "instructors" seminar. All payments for seminars were made in cash, money order, or cashier's check. An ADL representative told one of the participants that the cash-only policy was used because cash could not be traced by the government. Graduates of the "instructors" seminars were eligible to enroll new clients in ADL and would receive a portion of the fees the new enrollees paid.

The basic precept of the ADL's seminars was that anyone can, for federal income tax purposes, claim to be a "nonresident alien" with no domestic-source income. ADL instructors told participants that the Fourteenth Amendment changed the definition of citizenship so that only non-white residents of the territorial United States were actually "residents" for income tax purposes. Thus, Ambort and his co-defendants told customers that they were to claim on their income tax returns that they were nonresident aliens, regardless of their place of birth, and to write "n/a" in the place where the tax forms asked for the taxpayer's social security number. They also told customers that they could use IRS Form 1040X to file a corrected return for the previous three tax years, assert nonresident status for each year, and obtain a full refund of any taxes paid or withheld for that period.

Ambort was aware that the ADL position was not accepted law, and that the IRS had rejected it. He was aware that tax returns submitted by numerous ADL clients had been returned as frivolous by the IRS and had incurred penalties.

Ambort was tried and convicted by a jury, along with three of his alleged co-conspirators. The district court ordered Ambort detained pending sentencing. This court affirmed the district court's order denying his request for release pending sentencing and appeal. United States v. Ambort, No. 03-4117, 2003 WL 21685825 (10th Cir. July 18, 2003). The United States Supreme Court denied Ambort's petition for a writ of habeas corpus seeking his release pending appeal. In re Ambort, 124 S. Ct. 356 (mem.) (Oct. 6, 2003). The district court subsequently sentenced Ambort, pursuant to the United States Sentencing Commission, Guidelines Manual ("USSG"), to 108 months' imprisonment, the top end of Guideline range, followed by five years of supervised release.

In this fourth appearance before our court, Ambort argues (1) the district court erred by improperly limiting the scope of his good faith defense; (2) the district court erred in refusing to grant his motion to dismiss the indictment; and (3) the district court erred in enhancing his offense level based upon various

judge-found facts, in violation of <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), and <u>United States v. Booker</u>, 125 S. Ct. 738 (2005).[2]

## DISCUSSION

**I.      Good Faith Defense**

Ambort was charged with "willfully aid[ing] and assist[ing]" in the preparation of false income tax returns and with conspiring with others to do so. In the context of criminal tax statutes, the standard for willfulness "requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." <u>Cheek v. United States</u>, 498 U.S. 192, 201 (1991); <u>see</u> <u>United States v. Guidry</u>, 199 F.3d 1150, 1156 (10th Cir. 1999); <u>United States v. Willie</u>, 941 F.2d 1384, 1392 (10th Cir. 1991).

Ambort does not, and cannot, argue that he has a good faith belief that he is a nonresident alien not subject to taxation. We have specifically said as much, and Ambort concedes that his argument has been repeatedly rejected. <u>See</u> <u>Ambort v. United States</u>, 392 F.3d 1138, 1140 (10th Cir. 2004) ("The federal courts have long rejected Ambort's rationale for lack of tax liability."); <u>Benson v. United</u>

_____

[2]Both parties have filed supplemental briefs on the effect of <u>Blakely</u>. As indicated, <u>infra</u>, we consider the effect of <u>Blakely</u> in light of <u>Booker</u>.

-5-

<u>States</u>, Nos. 94-4182, 95-4061, 1995 WL 674615, at \*\*3 (10th Cir. Nov. 13, 1995) (unpublished) ("Mr. Ambort's argument that he is a nonresident alien not subject to taxation is frivolous.");[3] R. Vol. XXVII at 898.  He argues that he has a good faith belief that he was pursuing the proper procedure to attempt to change that law.  He relies upon the following passage from <u>Cheek</u>:  "There is no doubt that Cheek, from year to year, was free to pay the tax that the law purported to require, file for a refund and, if denied, present his claims of invalidity, constitutional or otherwise, to the courts."  <u>Cheek</u>, 498 U.S. at 206.  Ambort thus claims that he and the people he counsels in the ADL seminars are simply following the procedure outlined in <u>Cheek</u>, which demonstrates that they did not act willfully:  "[I]f a defendant has a good faith belief that he is using the proper procedure for challenging the tax laws, he has not acted wilfully under <u>Cheek</u>."  Appellant's Opening Br. at 9.

Ambort claims the district court impermissibly restricted his right to present that good faith defense by excluding as irrelevant certain testimony.  In particular, at several times during their trial, Ambort and his co-defendant, John Benson, talked about the procedures they were employing and were urging others to employ (pay the tax assessed, file for a refund, and seek further relief in court

---

[3]While we ordinarily do not cite unpublished opinions, we do so here because it directly relates to this case.  <u>See</u> 10th Cir. R. 36.3.

if the refund was denied) to challenge the established law as to who is a resident subject to taxation. On one occasion, the court responded to Ambort's testimony as follows:

> Let me interrupt here.
> I am going to give you the instructions of the law in a little while, not that long from now, but I do want you to understand what are and are not proper defenses. It is a proper defense to the crimes charged here for the defendants to claim that they had a good faith belief that what they were advocating was lawful even though it wasn't. A good faith belief is a defense.
> Even a good faith belief that resorting to knowing criminal activity as a method of gaining access to the court system is not a defense to a crime. I don't want there to be any confusion on that.

R. Vol. XXVIII at 1120-21. On another occasion, co-defendant Benson stated that he was "trying to explain why we gave the seminars and that is the same reason why when the tax court ruled against us that that has to happen if you're going to get that case up to the Supreme Court eventually and that is the system." R. Vol. XXVII at 961. The court responded "[n]ow, I am going to strike that from the record. I am going to strike that statement to the extent that it is trying to tell the jury what the system was. It is hard for me to see that that is relevant, you telling the jury that that is the system." Id.

Later in Benson's testimony, the following exchange occurred:

MR. BENSON: [A]s I read Section 7422 of the Internal Revenue Code it provided that instead of going against the collector you would bring your action against the government. It substituted the government in lieu of the collector. But they also said before you

could go against the government you had to first go through an administrative step of filing your claim for a refund.

MR. BAILEY [Government counsel]: Your Honor, I object. We seem to be getting away from the issues.

THE COURT: The objection is on what basis?

MR. BAILEY: Relevance.

THE COURT: Sustained.

MR. BENSON: Well, at any rate, I relied on my reading of Section 7422 as the right as an administrative—

MR. BAILEY: Same objection, Your Honor.

THE COURT: Mr. Benson, let me explain something about the law of evidence to you.
When I sustain an objection and find something irrelevant then you're [sic] next phrase cannot be, at any rate, and then you go right back into the same subject.

MR. BENSON: I was simply—

THE COURT: You may disagree with my ruling but it is the ruling and you have to move on to a different subject.

R. Vol. XXVIII at 1018-19. Ambort argues "[w]ith these rulings, the district court effectively precluded defendants from presenting and arguing the nature of their good faith in filing their claims." Appellant's Opening Br. at 15.

Neither Ambort nor Benson objected to the district court's evidentiary rulings, so our review is limited to determining whether the court's rulings were

plain error.[4] See United States v. Ramirez, 348 F.3d 1175, 1181 (10th Cir. 2003).

To establish plain error, Ambort must show that there is "(1) an error; (2) that is plain or obvious; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Hernandez-Rodriguez, 352 F.3d 1325, 1329 (10th Cir. 2003).

We conclude that the district court did not err, let alone commit plain error, when it excluded as irrelevant Ambort's or Benson's testimony on their good faith belief that they were pursuing the proper procedure to challenge the established law. The fundamental premise of Ambort's ADL teachings was that certain people could claim to be "nonresident aliens" not subject to the tax laws. Ambort knew that that viewpoint was contrary to well-established law. He cannot disguise his knowing disregard of well-established legal principles and duties as a good faith procedural effort to evade those principles and duties. As the Court stated in Cheek, "a defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness and need not be heard by the jury, and, if they are, an instruction to disregard them would be proper." Cheek, 498 U.S. at 206. That is precisely what the district court did in this case.

---

[4]Ambort argues that he really is objecting to the district court's rulings on the scope of the defense he attempted to present. He argues that we should review that issue de novo. Under any standard of review, we would uphold the district court's rulings.

Moreover, while Ambort places great reliance upon other language in Cheek stating that a taxpayer may challenge the tax laws by filing for a refund and appealing the denial of the refund to the courts, we have already reminded Ambort that "[a]n important qualification, made throughout the passage [in Cheek, referring to this "safe harbor" mechanism], however, is that a taxpayer also must be willing 'to accept the outcome.'" Ambort, 193 F.3d at 1171 n.1 (quoting Cheek, 498 U.S. at 206). In any event, "Cheek simply does not address any right to enlist and prepare returns on behalf of others, as alleged in this case." Id.

## II.    Denial of Motion to Dismiss Indictment

Ambort, adopting the argument in co-defendant Benson's brief, argues that the district court erred when it denied his motion to dismiss the indictment. Neither Ambort's nor Benson's briefs indicate which precise motion or motions are challenged. We therefore assume that the government's assessment is correct:

> [I]t appears that [Ambort] is referring to the defendants' joint motion to dismiss filed April 24, 2000, in which they contended, as here . . . that 26 U.S.C. [§] 7206 was overbroad as applied to their conduct, because it allegedly infringed on their putative First Amendment right to petition the government for redress. . . . Benson's brief also raises some arguments first presented to the District Court in [Ambort]'s September 26, 2000 motion to dismiss. . . . In that motion, [Ambort] asserted, as he does now . . . that § 7206 does not make criminal inaccurate statements of a legal position and that the indictment therefore failed to state an offense.

-10-

"Generally, we review the grant or denial of a motion to dismiss an indictment for an abuse of discretion. However, when the dismissal involves issues of statutory interpretation, or when the sufficiency of a charge is challenged, we review the district court's decision de novo." United States v. Giles, 213 F.3d 1247, 1248-49 (10th Cir. 2000) (citing United States v. Wood, 6 F.3d 692, 694 (10th Cir. 1993)). "We test the indictment 'solely on the basis of the allegations made on its face, and such allegations are to be taken as true.'" United States v. Reitmeyer, 356 F.3d 1313, 1316-17 (10th Cir. 2004) (quoting United States v. Hall, 20 F.3d 1084, 1087 (10th Cir. 1994)).

Ambort makes two arguments here: first that the government's prosecution of him has denied him his First Amendment right to petition for redress; and second, that, because he was following, and was encouraging others to follow, the "safe harbor" mechanism described in Cheek (to pay the tax, file for a refund and, if denied, petition the courts), and because the tax returns in question were accompanied by correct information, the indictment against him should have been dismissed because his conduct was not criminal under § 7206.

## A. First Amendment

As the government correctly points out, the First Amendment provides no protection for knowingly fraudulent or frivolous claims. "The first amendment interests involved in private litigation . . . are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims." Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743 (1983) (citing Thomas A. Balmer, Sham Litigation and the Antitrust Laws, 29 Buff. L. Rev. 39, 60 (1980)). The indictment alleged that Ambort and his co-defendants conspired to defraud the IRS by assisting in the filing of false tax returns and that, in particular, they told their ADL seminar attendees that they were "nonresident aliens" who were exempt from most United States income taxes, when "in truth and in fact as defendants . . . well knew. . . the . . . taxpayers were not." Indictment at 6-7, R. Vol. I. Claiming that they were actually pursuing in good faith what they believed was the proper procedure to attempt to evade the consequences of their intentional and knowing fraud does not somehow bring their conduct within the First Amendment's protection. As we have acknowledged, "the right to petition is not an absolute protection from liability." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 208 F.3d 885, 891 (10th Cir. 2000).

-12-

**B. Criminal Conduct Under § 7206**

Ambort also appears to argue that "[c]riminal tax law does not and cannot reach differences in legal positions" and that the conduct alleged in the indictment "is not a crime." Appellant Benson's Br. at 8, 16. He alleges that the tax returns in question were all submitted with correct information on them, but that he (and the taxpayers whose refunds he had helped prepare) simply came to a different legal conclusion as to their residency. He thus claims that his conduct did not constitute a crime under 26 U.S.C. § 7206(2).

The indictment alleged, as § 7206 requires, that Ambort conspired to and aided others in filing tax returns that were "false and fraudulent as to material matters." Indictment at 2, 6, R. Vol. I. The returns asserted that the taxpayers were nonresident aliens, when in fact, as Ambort knew, they were not nonresident aliens under well-established tax law principles. It is irrelevant that the returns may have also included information from which the IRS could, and in fact did, determine that the representation of residency status was false. The fact that the scheme ultimately failed to fool the IRS does not vitiate the fraudulent nature of the scheme.

## III. Sentencing Issues

In sentencing Ambort, the district court determined that his base offense level was nineteen, based upon an amount of loss exceeding $2.5 million but less than $5 million. The court then added two points for deriving substantial income from the enterprise, two points for the use of sophisticated means, two points for being in the business of assisting people in the filing of tax returns, and four points for being a leader and organizer, resulting in a Guidelines range of 87-108 months. The court sentenced Ambort to 108 months, the high end of the range.

In his opening brief on appeal, filed on May 7, 2004, Ambort argued only that the district court erred in enhancing his offense level by two points under USSG §2T1.1(b)(2) because "sophisticated means were used to impede discovery of the nature or extent of the offense." After his opening brief was filed, and while his appeal was pending, the Supreme Court held in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), that, "in a state prosecution the Sixth Amendment requires that the maximum permissible sentence in a given case must be determined solely by reference to 'facts reflected in the jury verdict or admitted by the defendant.'" United States v. Gonzalez-Huerta, No. 04-2045, 2005 WL 807008, at *1 (10th Cir. Apr. 8, 2005) (en banc) (quoting Blakely, 124 S. Ct. at 2537). In United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005), the Court applied Blakely's rationale to the federal sentencing guidelines: "[a]ny

-14-

fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 756. To remedy this constitutional infirmity the Court held the Guidelines are advisory. Booker applies to all cases pending on direct review. Id. at 769.

Ambort argues that under Blakely, his total offense level should be fourteen, not twenty-nine, as the district court found, because he claims the district court enhanced his base offense level after finding various factors which were not contained in the indictment, admitted by Ambort, or submitted to the jury. We consider that argument in light of Booker.

Because the district court judge enhanced Ambort's sentence based upon judge-found facts, Ambort presents a Sixth Amendment constitutional error under Booker. See Gonzalez-Huerta, 2005 WL 807008, at *2 (discussing difference between Booker constitutional error and Booker non-constitutional error). Although Ambort challenged the evidentiary basis for the judge-found facts as to the sentencing enhancements, he did not argue at trial that the use of the Guidelines violated the Constitution. See United States v. Dazey, Nos. 03-6187, 03-6205, 03-6208 & 03-6228, 2005 WL 846227, at *19 (10th Cir. Apr. 13, 2005). Because he failed to raise this issue below, we review for plain error. Gonzalez-

Huerta, 2005 WL 807008, at *3; cf. Booker, 125 S. Ct. at 769 ("[W]e expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test.").

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Gonzalez-Huerta, 2005 WL 807008, at *3 (further quotation omitted). "We conduct this analysis 'less rigidly when reviewing a potential constitutional error.'" Dazey, 2005 WL 846227, at *19 (quoting United States v. James, 257 F.3d 1173, 1182 (10th Cir. 2001)).

Under Booker it is clear that the district court erred when it sentenced Ambort, and that error is plain. See Gonzalez-Huerta, 2005 WL 807008, at *3; Dazey, 2005 WL 846227, at **19-20. We turn to the "more difficult question" of "whether the constitutional error in [Ambort's] case affects his substantial rights." Dazey, 2005 WL 846227, at *20. To affect the defendant's substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993). Ambort bears the burden of making this showing. Gonzalez-Huerta, 2005 WL 807008, at *3; see also United States v. Vonn, 535 U.S. 55, 63 (2002). To meet this burden, Ambort must show "'a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'"

-16-

Gonzalez-Huerta, 2005 WL 807008, at *3 (quoting United States v. Dominguez

Benitez, 524 U.S. 74, 124 S. Ct. 2333, 2339 (2004)).

We have recently stated:

> In a case of constitutional Booker error, there are at least two ways a
> defendant can make this showing. First, if the defendant shows a
> reasonable probability that a jury applying a reasonable doubt
> standard would not have found the same material facts that a judge
> found by a preponderance of the evidence, then the defendant
> successfully demonstrates that the error below affected his
> substantial rights. This inquiry requires the appellate court to review
> the evidence submitted at the sentencing hearing and the factual basis
> for any objection the defendant may have made to the facts on which
> the sentence was predicated. Second, a defendant may show that the
> district court's error affected his substantial rights by demonstrating
> a reasonable probability that, under the specific facts of his case as
> analyzed under the sentencing factors of 18 U.S.C. § 3553(a), the
> district court judge would reasonably impose a sentence outside the
> Guidelines range.

Dazey, 2005 WL 846227, at *20 (footnotes omitted). Ambort cannot satisfy

either test, nor does he demonstrate in any other way that his substantial rights

were affected.

Under the 1991 Guidelines applicable to Ambort's offense, the district

court determined Ambort caused a tax loss of more than $2.5 million, but less

than $5 million, which was less than that recommended by the probation office in

the PSR. While Ambort challenged that figure at his sentencing, the district court

concluded that it "can without any hesitation find beyond a preponderance of the

evidence that [the government] justif[ies] $2.6 million." R. Vol. XXXI at 28.

-17-

When the question of the amount of loss arose again later in the sentencing proceeding, and the district court indicated a willingness to take a recess to conduct further investigation into the proper amount of loss, defense counsel declined, stating "we understand how you have arrived at that and we understand you are giving the benefit to the defendants in one regard. . . . We will go ahead and submit it on that." Id. at 60. His concession at sentencing renders the amount of the loss as determined by the district court an admitted fact. Not surprisingly, Ambort did not challenge that finding in his initial appellate brief.

Ambort also contested the leader or organizer enhancement, claiming that the ADL participants were "kind of a loose collection of people, each of whom sort of had a role, and there is no question that Mr. Ambort in some way managed things . . . but I don't see those attributes of a true leader or organizer." R. Vol. XXXI at 15. The district court rejected that argument, finding:

> [a]s to role in the offense, I think that it is clear. Mr. Ambort by his own admission he was A.D.L. and he organized it, he spoke on the videotape, he spoke frequently about it, and his was the mailing address in Oregon where information was sent and he hired people to work for the organization. It was definitely in excess of the five persons required to qualify Mr. Ambort for four points as being an organizer or leader.

Id. at 66. Ambort again did not initially challenge that finding on appeal, and the record overwhelmingly supports that finding.

Ambort further contested the two-point enhancement for deriving substantial income from the enterprise and the two-point enhancement for being in the business of preparing or assisting in the preparation of tax returns. The district court found that it was "clear that [Ambort] received basically his entire livelihood" from his criminal enterprise, and that he clearly assisted in the preparation of tax returns. Id. at 60-61. Ambort did not challenge either one of those findings in his initial appellate brief, and the record overwhelming supports them.

Finally, the enhancement Ambort challenges most vigorously, and the only enhancement he challenged in his initial appellate brief, is the two-point enhancement for the use of sophisticated means. The 1991 Guidelines stated that "[i]f sophisticated means were used to impede discovery of the nature or extent of the offense, increase [the base offense level] by **2** levels." USSG §2T1.1(b)(2) (1991). The commentary provides that "'[s]ophisticated means,' as used in §2T1.1(b)(2), includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case. An enhancement would be applied for example, where the defendant used offshore bank accounts, or transactions through corporate shells." USSG §2T1.1(b)(2), comment. (n.6).

At sentencing, Ambort contested the factual basis for the district court's enhancement for use of sophisticated means, arguing that the ADL seminars were

advertised and conducted in the open, and really espoused a simple idea about tax liability. The district court rejected Ambort's argument, finding that Ambort had employed "sophisticated means," including:

> the overall operation of this program that was designed to provide a basis that someone could articulate later on for trying to explain to someone else why they, A, thought they were a non-resident alien and entitled to that status tax filing and, B, what history and case law precedent and all of the rest supported that belief. As a third element that it was genuinely held.

R. Vol. XXXI at 62. The court further explained:

> The fact that the seminars included information about how not to include proper addresses and not to include Social Security numbers which would allow the taxpayer to be more quickly traced, the use of the symbols N.A. . . . instead of a Social Security number, and the reasons why it shouldn't be on there, are just other examples of why sophisticated means were used to impede discovery of the nature or extent of the offense.

Id. The record amply supports the district court's conclusion.

Even "[t]aking the requisite 'less rigid[]' approach appropriate to constitutional error," Dazey, 2005 WL 846227, at *22, we conclude that Ambort has failed to show a reasonable probability that a jury evaluating the above evidence and applying a reasonable doubt standard would not have found the same material facts that the district court found with respect to Ambort's offense. The only enhancement which Ambort seriously contests on appeal is the one for the use of sophisticated means, and we conclude that the record overwhelming supports the application of that enhancement. See United States v. Riccardi, No.

03-3132, 2005 WL 896430, at *20 (10th Cir., Apr. 19, 2005) ("The plethora of evidence supporting the district court's factual findings strongly suggests that these findings were correct.").

We further conclude that there is no "reasonable probability that if the district judge had not thought himself bound by the mandatory Guidelines to sentence in accordance with these judge-found, preponderance-of-the-evidence facts," he might have determined that Ambort's conduct warranted a sentence lower than that imposed. Id. We observed in Dazey that a defendant might make such a showing "if during sentencing the district court expressed its view that the defendant's conduct, based on the record, did not warrant the minimum Guidelines sentence." Id. at *20. Nothing in the record in this case suggests that the district court, sentencing post-Booker under a discretionary system, would have imposed a lesser sentence, regardless of whether it found the identical enhancements appropriate.[5] Indeed, the court sentenced Ambort at the top of the Guideline range, although the court could have sentenced him anywhere within

---

[5]As we have recently acknowledged, "the Supreme Court's holding in Booker would not have prohibited the district court from making the same factual findings and applying the same enhancements and adjustments to [defendant's] sentence as long as it did not apply the Guidelines in a mandatory fashion." United States v. Lawrence, No. 02-1259, 2005 WL 906582, at *12 (10th Cir. Apr. 20, 2005); see also Dazey, 2005 WL 846227, at *21 (noting that constitutional Booker error "is the use of extra-verdict enhancements in a mandatory guidelines system").

that range.  See Riccardi, 2005 WL 896430, at *20 (noting that sentence at the top of the Guideline range supported the conclusion that the defendant's substantial rights were not violated); United States v. Lawrence, No. 02-1259, 2005 WL 906582, at *12 (10th Cir. Apr. 20, 2005) (noting that the district court's imposition of a sentence two months above the bottom of the range supported the conclusion that the defendant failed to show that his sentence would "likely change to a significant degree if [the case] were returned to the district court for discretionary resentencing" for purposes of meeting the fourth prong of plain-error review).  The district court gave no indication that it felt constrained in any way by the Guidelines, or in any way inclined to impose a different sentence.

In sum, because Ambort has failed to "show a reasonable probability that either the factual predicate for sentencing would be different if the district court were not required to sentence on the basis of judge-found, preponderance-of-the-evidence facts, or that the ensuing sentence would be different if the court were entitled to greater latitude in considering the sentencing factors of 18 U.S.C. § 3553(a), there is no basis for concluding that the error affected his substantial rights."  Dazey, 2005 WL 846227, at *21. We accordingly hold that Ambort has failed to establish that his substantial rights were violated by the district court's erroneous mandatory enhancement of his offense level and subsequent sentence

-22-

selection.  We therefore do not consider whether we need to notice any such error.[6]

## CONCLUSION

For the foregoing reasons, we AFFIRM Ambort's conviction and sentence.

---

[6]We note that, in <u>Gonzalez-Huerta</u>, we stated that we need not address the third prong of plain-error review if we conclude that the defendant could not satisfy the fourth prong by demonstrating that the district court's error seriously affected the fairness, integrity, or public reputation of judicial proceedings. <u>Gonzalez-Huerta</u>, 2005 WL 807008, at \*6; <u>see also</u> <u>United States v. Lawrence</u>, No. 02-1259, 2005 WL 906582, at \*12 (10th Cir. Apr. 20, 2005).  However, we see no reason not to resolve a case on the ground that the defendant failed to show that his substantial rights were affected, if the record makes it clear, as in this case, that the defendant has failed to meet his burden to show such an effect.

-23-