*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 06-2259

PAUL M. SEDORE,

*Defendant-Appellant*.

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00292—Gordon J. Quist, District Judge.

Argued: October 23, 2007

Decided and Filed: January 16, 2008

Before: MERRITT and CLAY, Circuit Judges; COX, District Judge.[*]

---

## COUNSEL

**ARGUED:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant. Matthew G. Borgula, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant. Matthew G. Borgula, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

COX, D. J., delivered the opinion of the court. CLAY, J. (p. 9), delivered a separate concurring opinion. MERRITT, J. (pp. 10-14), delivered a separate dissenting opinion.

---

## OPINION

---

COX, SEAN F., District Judge. This matter is before the Court on Defendant Paul M. Sedore's second appeal of his criminal sentence. Defendant challenges the application of sentencing enhancements based on (1) his abuse of a position of trust and (2) the number of victims. Defendant also alleges his sentence is substantively unreasonable. We find that Defendant did abuse a position of trust and waived his argument regarding the number of victims. Further, his sentence is not substantively unreasonable. Accordingly, we **AFFIRM** the decision of the district court.

---

[*] The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

## I.   BACKGROUND

This action arises out of the sentencing of Defendant for one count of conspiracy to defraud the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 286; and one count of identity theft in violation of 18 U.S.C. § 1028(a)(7).  From 1999 through 2002, Defendant engaged in a scheme to defraud the IRS by preparing false tax returns using stolen names and social security numbers. Defendant's aunt, Katherine King, also participated in the scheme.  Some of the names and social security numbers used for the false tax returns were obtained from legitimate tax returns Defendant prepared for friends and acquaintances.  One such instance involved an individual named Thaddeus Taylor ("Taylor") who Defendant met while in a rehabilitation facility.  Defendant prepared a legitimate tax return for Taylor.  However, Defendant filed false tax returns using the names and social security numbers of Taylor's children, which he obtained while preparing Taylor's tax return. Taylor was not a participant in the scheme. Other names and social security numbers were allegedly taken from a local newspaper that published such information in regard to child guardianship matters.

Defendant was incarcerated for most of the conspiracy.  Defendant, along with his aunt, claimed approximately $155,869.39 in refunds, and received $51,950.33 from the IRS.

A federal grand jury returned an indictment on December 18, 2003 charging Defendant with: (1) conspiring to defraud the IRS in violation of 18 U.S.C. § 286; (2) making false tax returns to the IRS in violation of 18 U.S.C. § 287; and (3) identity theft in violation of 18 U.S.C. § 1028(a)(7). On March 30, 2004, Defendant pled guilty to Counts I and III, conspiracy to defraud the IRS and identity theft.

Defendant filed four objections to the initial pre-sentence report.  He objected to:  (1) an enhancement for abuse of trust pursuant to U.S.S.G. § 3B1.3; (2) failure to award a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1; (3) an enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1; and (4) the finding that his crime included 50-250 victims, rather than 10-50 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A). [J.A. at 47].  The district court held a sentencing hearing on July 13, 2004, however the hearing was continued to August 3, 2004, to allow supplemental briefing regarding the applicability of the United States Sentencing Guidelines.  At the August 3, 2004 sentencing hearing, the district court accepted Defendant's argument with respect to his objections regarding acceptance of responsibility and agreed with Defendant's argument that there were only 31 victims.  The sentencing enhancement for number of victims was calculated based on 31 victims, rather than 50-250 victims.  The district court did not find in Defendant's favor on his objections to the obstruction of justice and abuse of trust enhancements.   Additionally, the court found Defendant's criminal history was under-represented and departed upwards. The district court determined that Defendant's offense level was 22 with a criminal history category of VI, resulting in a guideline range of 84 to 105 months.  On August 3, 2004, the district court sentenced Defendant to 84 months.

Defendant appealed his sentence, arguing that the district court erred when it: (1) found he has a special skill for purposes of the abuse of trust enhancement; (2) found he obstructed justice; (3) enhanced his base offense level on facts found by a preponderance of the evidence contrary to *United States v. Booker*, 543 U.S. 220 (2005); and (4) departed upward based on his past criminal history. On April 13, 2006, this Court vacated the sentence and remanded the case for re-sentencing pursuant to *Booker*.  In addition, we stated that, for guidance, the district court should consider the Tenth Circuit case *United States v. Guidry*, 199 F.3d 1150, 1160 (10th Cir. 1999), with respect to whether Defendant occupied a position of trust. *United States v. Sedore*, 175 Fed.Appx. 714 (6th Cir. 2006)

Defendant's re-sentencing hearing was held on September 5, 2006. In his sentencing memorandum for re-sentencing, Defendant argued, in addition to his previous arguments, that the district court erred when it found at his first sentencing that there were more than ten victims. At the re-sentencing hearing, the district court addressed the abuse of trust enhancement and stated that the enhancement was applied with respect to the identity theft charge, based on Defendant's use of Taylor's children's information. [J.A. at 205]. The district court also reaffirmed its finding with respect to the obstruction of justice enhancement. However, the number of victims argument was not addressed at the hearing and Defendant did not raise it. The district court found that Defendant's offense level was 21, including a two point upward departure, and extrapolated a criminal history category of VIII. The advisory sentencing guideline range was 77-96. The district court sentenced Defendant to a term of 84 months.

Defendant filed the instant appeal on September 11, 2006. Defendant argues that the district court misapplied U.S.S.G. § 3B1.3 when it enhanced his sentence based on an abuse of a position of trust. According to Defendant, the district court erred by imputing the relationship between Taylor and Defendant to Taylor's children and Defendant. Defendant argues that under *Guidry*, *supra*, the position of trust must be found in relation to the victim of the offense, and there must be pecuniary loss. According to Defendant, the victims of the offense of identity theft are Taylor's children, with whom Defendant did not have a position of trust and who suffered no pecuniary loss. Defendant concludes that because the § 3B1.3 enhancement was predicated on Defendant's relationship with Taylor, whose identity was not stolen, the enhancement is improper. Defendant further contends that the district court misapplied § 2B1.1(B)(2) when it found that the number of victims was between 10-50. Defendant asserts that, consistent with *Guidry*, only the IRS suffered pecuniary loss and is, therefore, the only "victim."

Finally, Defendant asks the Court to order that on remand the re-sentencing range is limited to 51 to 63 months, assuming the Court finds for Defendant on his arguments. In the alternative, Defendant asks that if this Court declines to issue a limited remand, that it require the district court to explain in detail its reasons for the sentence it imposes. Specifically, Defendant is concerned that the district court will choose to further increase the offense level, above the two points added under the previous re-sentencing, out of vindictiveness.

## II.   STANDARD OF REVIEW

We review a district court's sentencing determination for reasonableness. *United States v. Wilms*, 495 F.3d 277, 280 (6th Cir. 2007). Reasonableness has both substantive and procedural components. *United States v. Liou*, 491 F.3d 334, 337 (6th Cir. 2007). "As to procedural reasonableness, we have held that 'a sentence may be procedurally unreasonable if the district judge fails to consider the applicable Guidelines range or neglects to consider the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration.'" *Id.* (citing *United States v. Jones*, 489 F.3d 243, 250 (6th Cir. 2007)). "In considering substantive reasonableness, we have held that 'a sentence may be substantively unreasonable where the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors, or gives an unreasonable amount of weight to any pertinent factor.'" *Liou*, 491 F.3d at 337 (citations omitted). A rebuttable presumption of substantive reasonableness applies for sentences that fall within the applicable sentencing guideline range. *Id.* *See also Rita v. United States*, 127 S.Ct. 2456, 2459 (2007)(holding that the courts of appeals may apply a presumption of reasonableness for sentences within the advisory Guidelines range).

### III.   ANALYSIS

On appeal, Defendant raises three arguments: (1) the district court erred by enhancing Defendant's sentence pursuant to U.S.S.G. § 3B1.3; (2) the district court erred by enhancing Defendant's sentence pursuant to U.S.S.G. § 2B1.1(b)(2)(A); and (3) Defendant's sentence was substantively unreasonable.

### A.     Sentencing Enhancement Under U.S.S.G. § 3B1.3

Defendant contends that the district court erred by applying a two level enhancement to his offense level pursuant to U.S.S.G. § 3B1.3, which provides in pertinent part, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."

The district court applied the position of trust enhancement specifically with respect to Thaddeus Taylor:

> I overrule the objection under 3B1.3. Based on the testimony, Thaddeus Taylor was a victim. He gave the names and Social Security numbers of his children based on his trust that Mr. Sedore would be, if not a certified tax preparer, certainly a trusted tax preparer to file tax returns for his children. And Mr. Sedore violated that trust by using the names and Social Security numbers of his children for his own purposes. And, as I said, therefore, the objection is overruled.

[J.A. at 184]. In the initial appeal, we remanded for re-sentencing in light of *Booker*, and did not address whether the enhancement under § 3B1.3 was proper. However, we did note that:

> [I]n determining whether Sedore abused a position of trust under U.S.S.G. § 3B1.3, the district court may reevaluate whether Sedore occupied a position of trust, reassessing who qualifies as a victim within the meaning of U.S.S.G. § 2B1.1 cmt n.1 - the IRS and/or the individuals whose personal information Sedore used for his scheme. See *United States v. Guidry*, 199 F.3d 1150, 1160 (10th Cir. 1999)(holding that a "position of trust must be found in relation to the victim of the offense" and concluding that, although the government was the victim of the defendant's false tax-return filings, the defendant did not occupy a position of trust with the government).

Sedore, 175 Fed.Appx. at 714.

At the re-sentencing, the parties debated the intent of this Court in directing the district court to consider *Guidry* and the commentary following § 2B1.1.[1] After hearing argument, the district court held:

> I reconsidered it, and I'm going to rule the same way for the same reasons. And that is, if you take a look at Count 4, the theft is of the identity of one or more persons who he used without lawful authority with the intent to commit and aid and abet a violation of federal law. Forget all of the people whose names were in the newspapers where he got the information. Focus simply on Thaddeus Taylor and his family. That was an abuse of a position of trust for Thaddeus Taylor and his family,

---

[1] Section 2B1.1 cmt n.1 provides that for purposes of that section, "victim" means "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." Note 3 of the same commentary defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt n.3.

where he got the information by preparing income tax returns for Taylor at Mr. Taylor's request and then utilized the information using the names of the children in the Taylor family to line his own pockets. And in my judgment, that's exactly what identity theft is. It might not be a pecuniary loss, but 3B1.1, as pointed out by the government, doesn't require it for that particular enhancement. So that's the ruling.

[J.A. at 210-211].

The district court held that the requirement of pecuniary loss in U.S.S.G. § 2B1.1 does not apply to U.S.S.G. § 3B1.3. The district court also found *Guidry* inapplicable because in the instant case, the § 3B1.3 enhancement was applied based on the identity theft count, not the false claims count. Thus, the district court held that Defendant used his position of trust with Taylor to steal the identities of Taylor's children, for use in filing false tax returns. Regardless of whether the children suffered a pecuniary loss, the district court found they were victims, justifying application of the enhancement.

In the instant appeal, Defendant contends the enhancement should not apply because he did not hold a position of trust with Taylor's children, and they are the only victims of the charged offense. The plain language of § 3B1.3 states that "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," the enhancement applies. Defendant does not deny that he held a position of trust with Taylor, or that he stole Taylor's children's personal information. Under the plain language of § 3B1.3, Defendant abused his position of trust with Taylor in a manner that significantly facilitated the offense of identity theft with respect to Taylor's children - and the enhancement should apply. However, there is a line of cases that seemingly narrows the broad application of this enhancement. This Circuit has held that "[i]n order for the abuse of a position of trust enhancement to be applied to a defendant, the evidence must show that the defendant's position with the *victim of the offense* significantly facilitated the commission of the offense." *United States v. Moored*, 997 F.2d 139, 145 (6th Cir. 1993)(emphasis added). *See also United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001)(citing *Moored*)("The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust *with the victim of his charged conduct*.")(emphasis added); and *United States v. Duerson*, 25 F.3d 376, 383 (6th Cir. 1994)("We held in *Moored* that a defendant's offense level could not be increased for abuse of a position of trust unless *the person or entity with which the defendant held such a position was a victim or intended victim of the offense*.")(emphasis added).

It is on *Moored*, *supra*, and its progeny, that Defendant relies for his argument that the enhancement should not apply. In *Moored*, the defendant used his position as a trustee at a local college to bolster his credibility with lenders and fraudulently obtain a loan. The defendant pled guilty to fraud charges. The district court applied a two-level enhancement for abuse of a position of trust pursuant to § 3B1.3. The district court held "Mr. Moored's affiliation with Jordan College as an officer, trustee, and/or affiliate was used to facilitate the commission of the fraudulent documents that were sent through the wire, and therefore, the two point addition under 3B1.3 is clearly in order in this particular matter." *Moored*, 997 F.2d at 142.

This Court agreed that in the commission of the offense, the defendant abused his position of trust with the college. However, this Court disagreed that the abuse was sufficient to warrant application of the enhancement for abuse of a position of trust. The defendant argued that his position was "no different from any other loan applicant's" and that finding his crime worthy of the abuse of trust enhancement "would permit an enhancement for any defrauding borrower who, in the course of loan negotiations, discloses a position of trust, even if that position had nothing to do with the loan decision." *Id.* at 144. The *Moored* court noted that the situation in which a defendant abused a position of trust with someone other than the victim of the charged conduct was novel. The

*Moored* court found that the district court's approach was "overly broad." *Id.* at 145. The court held:

> Applying the standard that the lower court applied, a sentencing court would enhance the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise. An argument could be made in virtually every case that the position of trust, though not directly a part of the offense conduct, had some remote connection with the defendant's crime.
>
> In order for the abuse of a position of trust enhancement to be applied to a defendant, the evidence must show that the defendant's position with the victim of the offense significantly facilitated the commission of the offense. In this case, the Defendant held no position of trust with the intended victims of his offense. Accordingly, we find that the district court incorrectly enhanced Defendant's offense level.

*Moored*, 997 F.2d at 145.

In this case, the district court stated that it applied the § 3B1.3 enhancement based on an abuse of Defendant's position of trust with Taylor, specifically in regards to the identity theft of Taylor's children's information. The first issue is whether Defendant held a position of trust with the victims of the charged offense of identity theft, i.e. Taylor's children. The government argues that the relationship between Defendant and Taylor should be imputed to Taylor's children, who relied upon their father's relationship with his tax preparer to protect their confidential information.

We agree with the government's argument under these particular circumstances. It is undisputed for purposes of this appeal, that Defendant held a position of trust with Taylor. Defendant, in the course of preparing legitimate tax returns for Taylor, obtained Taylor's children's personal information and used that information to file false tax returns. Where a parent provides the personal information of his children for the purpose of tax preparation, it is reasonable that any trust relationship between the parent and the preparer extends to the children and the preparer. This is different than the situation addressed in *Moored*. In *Moored*, this Court was concerned with application of § 3B1.3 where the position of trust relied on to support the enhancement had nothing to do with the conduct that was the substance of the charged offense. This Court sought to prevent application of the enhancement where the relied on position of trust had only "some remote connection with the defendant's crime." *Moored*, 997 F.2d at 145. Such is not the case here. Defendant's position of trust with Taylor was his sole means of gaining Taylor's children's personal information. Further, Taylor only provided his children's information to facilitate legitimate tax return preparation. Under these circumstances, the district court was correct in extending the position of trust Defendant held with Taylor to Taylor's children.

In his Reply, Defendant also appears to argue that Taylor's children cannot be considered victims for purposes of § 3B1.3 because they did not suffer pecuniary loss. Nothing in the language of U.S.S.G. § 3B1.3, or the commentary following it, indicates that pecuniary loss is a necessary element for application of the enhancement. The definition of "victim" provided in the commentary following § 2B1.1, cited by Defendant, specifically states the definition is for purposes of that guideline. U.S.S.G. § 2B1.1 cmt n.1.

In this case, Defendant does not offer any basis for imposing a requirement that the victim for purposes of a § 3B1.3 enhancement must suffer pecuniary loss, and we do not find any.

Accordingly, application of the two point enhancement pursuant to U.S.S.G. § 3B1.3 was proper.

**B.        Sentencing Enhancement Under U.S.S.G. § 2B1.1(b)(2)(A)**

Defendant contends the district court erred by applying a two level enhancement under U.S.S.G. § 2B1.1(b)(2)(A). Section 2B1.1(b)(2)(A) provides that when 10 or more victims are involved, the offense level is increased by 2 levels. For purposes of §2B1.1, "victim" is defined as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1 cmt n.1. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at cmt n.3. At the initial sentencing on August 3, 2004, counsel for Defendant stated that it is his position "and Mr. Sedore's position that when we totaled up the information submitted from the Probation Department, that there were thirty-one actual victims . . . [s]o it was our position that the actual number of victims itself was thirty-one." [J.A. 147]. The court accepted Defendant's admission that the number of victims was 31 and applied a two level enhancement.

Following this Court's ruling in Defendant's first appeal, as outlined above, the case was remanded for re-sentencing. In his re-sentencing memorandum, filed June 30, 2006, Defendant asserted that this Court suggested that the IRS was the victim, rather than the individual taxpayers. Based on Defendant's interpretation of this Court's "suggestion," Defendant contends that the number of victims is one. However, Defendant did not raise the issue at the re-sentencing hearing and it was not addressed by the district court.

The government argues that Defendant waived any argument that the IRS was the only victim because he did not raise the issue in his first appeal to this Court and because Defendant is bound by his admission at his initial sentencing that there were 31 victims.

We agree that Defendant is bound by his admission. It would be unreasonable to allow a defendant to admit to a particular fact during sentencing, and then argue against the existence of that fact on appeal. Further, Defendant did not present any evidence to this Court that he argued in his initial appeal that the enhancement pursuant to § 2B1.1(b)(2)(A) was improper because the IRS was the only victim.**2** If Defendant did not raise the argument in his first appeal, he is now foreclosed from making such a claim. Generally, "on remand following a direct appeal, a district court can consider de novo any arguments regarding sentencing if the remand order does not limit its review." *United States v. Saikaly*, 207 F.3d 363, 369 (6th Cir. 2000). However, "when a party fails to seek review of a district court's final order, it is barred from reasserting that issue in any subsequent appeals occurring in that case." *United States v. McKinley*, 227 F.3d 716, 718 (6th Cir. 2000). In *McKinley*, the Court ruled that the government waived its argument for application of a sentence enhancement that was available in the first appeal but not pursued. *Id*. at 718-719. "While the district court may entertain any issues it feels are relevant to the overall sentencing decision (following a general remand), this does not give the parties license to re-assert issues that they should have raised during an earlier appeal." *Id.* at 718 (internal citation omitted). The court noted that the waiver doctrine "exists to forestall this kind of perpetual litigation by notifying parties that they will forfeit their claims if they fail to seek review in the first appeal." *Id.* at 719.

Accordingly, because Defendant admitted at his initial sentencing on August 3, 2004 that the number of victims was 31, and does not offer evidence that an argument to the contrary was raised on his appeal of that sentence, Defendant is bound by his admission and any argument to the contrary is waived.

---

**2**In his Reply, Defendant claims that "[c]ontrary to the government's assertion, Paul Sedore did challenge the district court's determination regarding the number of victims involved in his offense conduct . . . [i]n the brief filed in his first appeal, Mr. Sedore specifically challenged the enhancement for the number of victims. *United States v. Paul Michael Sedore*, No. 05-1028, Final Brief of Appellant at 34-37." However, the brief was not included as part of the Joint Appendix.

### C.      **Substantive Reasonableness**

Defendant argues that his sentence is substantively unreasonable because Defendant's "conduct does not warrant a sentence of this length . . . " [Brief, p.9].  However, Defendant's brief was submitted before the Supreme Court decided *Rita, supra,* and *Gall v. United States*, --- S.Ct.----, No. 06-7949, 2007 WL 4292116 (2007).  In *Rita* and *Gall*, the Supreme Court upheld the application of a presumption of reasonableness to sentences that fall within the applicable Sentencing Guidelines range.  *Liou*, 491 F.3d at 338 (citing *Rita*, 127 S.Ct. at 2459).  Defendant does not convince us that this presumption of reasonableness does not apply to his case simply by stating that his sentence was too long.  *See United States v. Crowell*, 493 F.3d 744, 751 (6th Cir. 2007)("[The defendant] contends the sentence is longer than it need be, but the 'mere allegation that the sentence imposed is greater than necessary to achieve the goals of punishment in § 3553(a) is insufficient to rebut the presumption of reasonableness.")(citation omitted).  Defendant fails to offer any explanation as to why 84 months is an unreasonably lengthy sentence.  Accordingly, we find that the sentence imposed by the district court was not unreasonable.

## IV.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.

---

**CONCURRENCE**

---

CLAY, Circuit Judge, concurring.  I agree with the analysis presented and the conclusion reached by Judge Cox in his opinion for the panel, which I join in full.  However, I write separately to respond to Judge Merritt's criticism of the result reached in this case.

In his dissent, Judge Merritt suggests that this case is an example of what he calls "the problem of guidelineism or 'guidelinitis.'"  Merritt, J., dissenting at 10.  While I fully appreciate Judge Merritt's concern about the failure of many sentencing judges to engage an "individualized assessment based the facts presented," *Gall v. United States*, 552 U.S. __, 128 S. Ct. 586, 597 (2007), I do not find that the sentencing judge *in this case* was derelict in his duty to tailor Defendant's sentence based upon *all* of the sentencing considerations found in 18 U.S.C. § 3553(a), and not just upon the advisory Guidelines range.

I also find Judge Merritt's explanation of the ideal sentencing procedure to be inconsistent with the Supreme Court's most recent sentencing pronouncements.  Contrary to what Judge Merritt suggests, the Supreme Court in *Gall* did not direct district court judges to start only with the Guidelines base offense level and then make adjustments to that level based upon his or her own sentencing discretion.  *See* Merritt, J., dissenting at 12.  Rather, the Supreme Court directed district judges to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range" which would then serve as the "starting point and the initial benchmark" for sentencing.  *Gall*, 128 S. Ct. at 596.  This "applicable Guidelines range" includes not only the base offense level recommended by the Guidelines, but also any applicable adjustments to that level which the Sentencing Commission has recommended in the Guidelines.  Thus, contrary to what Judge Merritt claims, post-*Booker*, sentencing judges must begin their sentencing deliberations by properly calculating the *entire* recommended Guidelines sentencing range, including any sentencing enhancements, not just the Guidelines-recommended base offense level.  However, Judge Merritt is correct in emphasizing that after judges have determined this advisory Guidelines range, they must "then consider all of [the other] § 3553(a) factors" and "make an individualized assessment based on the facts presented."  *Id.* at 596-97.  In this process, judges must use their discretion and should not unreflectively impose a within-Guidelines sentence.  During this "individualized assessment" process, sentencing judges should not permit the Guidelines to be a strait-jacket which compel a particular sentence, but rather, as their name suggests, a helpful "guide" for crafting a sentence which is "sufficient but not greater than necessary to comply with the purposes" of sentencing set forth in § 3553(a).

Inasmuch as the judge in this case engaged in such an "individualized assessment" after properly calculating the advisory Guidelines range, including the applicable sentencing enhancements under the Guidelines, I am not persuaded that he committed a reversible sentencing error and, accordingly, I join Judge Cox in affirming Defendant's sentence.

————————————

## DISSENT

————————————

MERRITT, Circuit Judge, dissenting.  Except for those judges and lawyers who prefer to continue routine conformity to the old pre-*Blakely-Booker* process of guideline sentencing, there is widespread disapproval of the present muddled system.  This is because, in the main, the old system is just continuing on as though nothing had happened — continuing under the pretext that the guidelines are only "advisory" instead of being considered only as a starting point against the backdrop of the more sensible and humane penalogical goals set out in § 3553(a), Title 18.  This case is one more example of the continuing problem, the problem of guidelineism, or "guidelinitis," the inability of most federal courts to break their habit of mechanically relying just on the guidelines alone.

By ratcheting up the sentence, as is typical under the guidelines, piling aggravator on aggravator, the District Court (as though *Booker* had never been decided), went from a base offense level of 6 with criminal history Category VI (corresponding to defendant's guilty plea) — carrying a penalty of 12-18 months — to offense level 22.  It then sentenced him to 7 years — 5 times more than the base offense level corresponding to the facts of the guilty plea.

Such harsh sentences are par for the course under the guidelines.  The sentencing court imposed a harsh sentence without seriously considering mitigating family and personal factors or rehabilitation possibilities — all in line with the U.S. Sentencing Commission rules against the consideration of such individual factors in Chapters 5H and 5K of the Guidelines.[1]  This refusal to seriously consider individual factors, including rehabilitation, has been the most important characteristic of the work of the Sentencing Commission.  From the beginning, the guidelines have emphasized collectives, not individuals; and individualized sentencing by federal judges, the weighing of aggravators and mitigators through a process of dialectic reflection and reconciliation, has become a relic of the past.  The creation of these guidelines involved the breakdown of behavior into smaller and smaller parts and categories of aggravators or enhancements without consideration of other important individual factors.

———————————

[1]The Commission's "not relevant" rule against consideration of a host of mitigating factors such as age, physical condition, education, employment, military, public service, good works, disadvantaged upbringing, addiction, mental illness, family ties, and rehabilitation possibilities are directly contrary to the Supreme Court's interpretation of the Eighth Amendment in *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), requiring states in sentencing to consider such mitigating factors.  The Sentencing Commission, and now the federal courts at its direction, refuse to take into account the mitigating and humanizing factors that *Lockett* and *Eddings* require.  There is no indication that any such factors were considered or influenced the sentence in this case.

The ratcheting-up process in the instant case was all based upon judicial findings of fact.[2] It is obvious to anyone who has watched this disingenuous process develop that the present system is completely inconsistent with the *Blakely* and *Booker* opinions, which confine judicial fact finding to those facts carrying out a jury verdict or plea of guilty. As the Court said in *Cunningham*, "under the Sixth Amendment, any fact that *exposes* a defendant to a greater *potential* sentence must be found by a jury, not a judge." *Cunningham v. California*, 127 S. Ct. 856, 863-64 (2007) (emphasis added). This statement of the Sixth Amendment rule was first stated in *Blakely* even more clearly and then repeated in *Booker* and *Rita*. It is still unclear, however, whether the Supreme Court is going to abide by or erode and then reject the clear holding of *Blakely*:

> [T]he '*statutory maximum' for Apprendi purposes* is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without any additional findings*. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority.

*Blakely v. Washington*, 542 U.S. 296, 303-04 (2005) (emphasis added). What is clear is that the district courts and the courts of appeals, as the majority in this case expressly acknowledges, are not applying this rule and do not believe the Supreme Court actually intends to enforce it. The view seems to be that the remedial opinion in *Booker* is inconsistent with this rule, and so the rule may be simply disregarded in practice.[3] Justice Scalia predicted such a result in *Booker*, noting that the Court's remedial scheme risked preserving "*de facto* mandatory guidelines by discouraging district courts from sentencing outside Guidelines ranges." *United States v. Booker*, 543 U.S. 220, 313 (2005) (Scalia, J., dissenting). Indeed, this *de facto*, mandatory application of the guidelines runs afoul of the Supreme Court's admonition that "*Booker*'s remedy for the Federal Guidelines . . . is not a recipe for rendering our Sixth Amendment case law toothless." *Cunningham v. California*, 127 S. Ct. 856, 870 (2007). Many of the members of the Supreme Court have recognized in

---

[2]It is significant that in the recent cases, *Rita v. United States*, 127 S. Ct. 2456 (2007), *Gall v. United States*, 2007 U.S. LEXIS 13083 (Dec. 10, 2007), and *Kimbrough v. United States*, 2007 U.S. LEXIS 13082 (Dec. 10, 2007), in which the Supreme Court upheld the district court sentences, *the sentence was within or below the guideline range corresponding to the jury verdict or guilty plea*. There was no ratcheting up of the sentence by enhancements outside of the initial sentencing range. There were no judicial fact findings that raised the sentence, and there is no Supreme Court case that allows a court to use guideline enhancements to raise a sentence above the guideline range corresponding to the jury verdict or plea. So when the Supreme Court uses the phrase "within the guidelines," as it does frequently in these cases, it is not yet clear what precisely it means or that it means enhanced sentences based on findings of facts by the judge over and above the facts found by the jury verdict or the guilty plea.

The Supreme Court did not say in *Gall* or *Rita* that the sentencing judge should "start" the sentencing process by enhancing the sentence aggravator by aggravator, as happened in the instant case. The Court said that the sentencing judge should begin with the "applicable Guidelines range" which in *Gall* was the initial base offense level corresponding to facts admitted by the guilty plea, which carried a range of 30 to 37 months. There is no language in *Gall* or *Rita* that requires appellate or district judges to "begin" with the enhancement process. That process is directly contrary to the language quoted below in *Blakely* that a "judge exceeds his proper authority" by basing a higher sentence on judicial findings outside the jury verdict.

[3]The empirical data on this point are clear. From 1990-2003, 90.6% of offenders received sentences adhering to the Guidelines range. In 2006, after *Booker* purportedly made the Guidelines "advisory," 86.3% of offenders still received sentences in the Guidelines range, a range including judicial enhancements. Furthermore, appellate review of these within-Guidelines sentences has not changed post-*Booker*, as circuit courts have affirmed 99.9% of within-Guidelines sentences. Conversely, Circuit courts reversed below Guidelines sentences almost 85% of the time, while only reversing above-Guidelines sentences in less than 5% of the cases. *See* James Bilsborrow, Note, *Sentencing Acquitted Conduct to the Post-Booker Dustbin*, 49 WM. & MARY L. REV. 289, 314-15 (2007).

opinions at one time or another the unprincipled, inconsistent nature of the sentencing game in which we are now engaged.[4]

The only way to begin to return the process to something consistent with the Sixth Amendment and with the concept of individualized sentencing is to recognize and insist that we adhere to two overriding principles: *First*, that judicial fact finding and the length of a sentence be limited somewhere within the base-offense-level, guideline range corresponding to the jury verdict or the plea, unless the sentencing judge explains why the concepts of general and individual deterrence should require a longer sentence for the particular individual and outweigh the mitigating circumstances of the case (including factors like age, addiction, and family responsibility deemed irrelevant by the Sentencing Commission in Chapters 5H and 5K), as well as the likelihood of successful rehabilitation. *Second*, that the sentencing judge explain the weighing process outlined above (taking into account moral culpability, general and special deterrence, mitigating circumstances and rehabilitation) so that the sentence and its explanation comply with the "overarching provision instructing district courts to 'impose a sentence . . . not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 2007 U.S. LEXIS 13082, at *30 (Dec. 10, 2007) (quoting 18 U.S.C. § 3553(a)). This "overarching provision," enacted by Congress in § 3553(a), sets a humane, balancing standard that the sentencing judge should keep as the Golden Mean governing the judicial reflection necessary in each sentencing case to reconcile contrary factors and arguments in the weighing process in order to arrive at a fair sentence.

In other words, the sentencing judge should start with the base offense level corresponding to the facts found by the jury verdict or admitted by the guilty plea. The sentencing judge should not go up or down from that point unless in his or her own mind the weighing process of the two overriding principles stated above requires it. The judge should not engage in guidelineism, adjusting the sentence up or down just because the guidelines say so, as occurred in the instant case, but rather because the judge's own sense of justice, upon reflection, leads to a different result than the beginning, base-offense level. This allows the guidelines to play a pivotal role to begin with but requires the judge to use his or her own mental faculties and best judgment, just as judges did in the days of indeterminate sentencing before the mandatory federal sentencing guideline era.

The job of the Court of Appeals should be only to see that the federal sentencing judge (1) starts at the right place in the reasoning process (at the base offense level corresponding to the jury verdict or guilty plea), as required by the Sixth Amendment as interpreted by *Blakely* and *Booker*, and (2) engages in a general process of serious dialectical reflection and reconciliation, as evidenced by the reasons given for deviating from the starting point established under Sixth Amendment constraints. This process should put an end to the rote, ratcheting-up process that now characterizes the sentencing process, a process based on the Commission's rule that mitigating factors are "not relevant."

This modified system based on these two principles is, more or less, what the system would have looked like in the beginning if the Guidelines were truly "guidelines" rather than mandatory rules. If the Commission, in the beginning, as many judges and lawyers recommended, had adopted guidelines to assist judges rather than to discipline and correct judges this modified system would have perhaps provided a workable system. I myself testified before the Commission advising it not to saddle the judiciary with mandatory rules that are constitutionally suspect because such rules

---

[4]See, for example, the separate opinions of Justice Stevens ("I am not blind to the fact" that "many federal judges continue to treat the Guidelines as virtually mandatory"); Justices Scalia and Thomas, ("no one knows — and perhaps no one is meant to know — how advisory Guidelines . . . will function in practice"); Justice Souter ("consistency began to falter," the "gravitational pull to now-discretionary Guidelines . . . preserve the very feature . . . that threaten to trivialize the jury right" so that it is "fair to ask just what has been accomplished"). *See Rita*, 127 S. Ct. 2456, 2474, 2475, 2487-88.

would most likely eliminate individualized sentencing and full consideration of mitigating factors. The Commission, however, believed that federal judges could not be trusted to exercise discretion properly and that harsher sentencing rules must be imposed on judges in order to insure longer sentences and collective uniformity. The current Guidelines that ratchet up sentences without considering mitigating factors or rehabilitation are the result.

The modified system described above is a different process of sentencing from either pure indeterminate sentencing, as it operated before the guidelines, or the mandatory, rote guideline process that prevailed before the Sixth Amendment was recognized as a limitation on fact finding. Hopefully, such a modified system would begin to provide a balance between the collectivized, sentencing process of lock-step, upward adjustments heretofore required by the Commission, and the thoughtful individual sentencing by federal judges that was the ideal behind the federal sentencing system used so effectively (in my opinion) for 200 years since the first Congress enacted the first sentencing law, 1 Stat. 112, ch. 9 (1790).[5] Further, a system that incorporates facets of indeterminate sentencing preserves the historical role of judges as sentencing experts and the jury as fact finder. Sentencing procedures based on these roles were never challenged as undermining the Sixth Amendment's right to a jury trial because judges did not function as objective fact finders and judge-found facts did not carry determinate consequences.

Such a modified system includes an element of democratic, legislative control over sentencing while keeping elements of individualized sentencing from the old system. Such a modified system may be strongly resisted by prosecutors and the Department of Justice officials who have now become accustomed to controlling sentencing through the charging process, the release of enhancement information to probation officers and plea bargaining. Back in my day as U.S. Attorney 40 years ago, prosecutors were viewed solely as parties to the case and not entitled to control the length of the sentence. Removing control of sentencing from the prosecutorial arm of the government should be viewed as a step forward, although it is really a step back in history to restore the benefits of individualized sentencing practiced by English and American judges since the beginning of the 18th Century.

The modified scheme proposed above squares with the most recent Supreme Court decision, *Gall v. United States*, No. 06-7949, 2007 U.S. LEXIS 13083, at *21 (December 10, 2007), in which the Court instructed district court judges to "make an individualized assessment based on the facts presented" with the Guidelines operating as the "initial benchmark" but "not the only consideration." In *Gall,* the Supreme Court affirmed the district court's sentence of thirty-six months probation, a punishment based upon the district judge's individualized evaluation of the factors under 18 U.S.C. § 3553(a) — particularly rehabilitation — and rejected the appellate court's rote application of the Guidelines. Moreover, this approach lessens the likelihood of as-applied Sixth Amendment challenges, which, as Justice Scalia points out, are still available. *Id.* at *39 (Scalia, J., concurring).

Unfortunately, the sentencing process in this case was just a repeat of guidelinitis, the system of rote sentencing in which the sentencing judge ratchets up the sentence instead of engaging in anything close to the deliberative or reflective process outlined by the two overriding principles stated above. Hence, I would reverse and remand the case for resentencing in compliance with the

---

[5]The system of jury fact finding and individualized sentencing by judges enacted by the First Congress was the system developed to reconcile justice with mercy by our judicial forebearers as the English system of criminal law — developed particularly after the demise of the prerogative courts of Star Chamber and High Commission following the English civil war, the Glorious revolution of 1688, the English Bill of Rights of 1689, and the creation of an independent judiciary in the Judges' Bills of 1692 and 1701. *See* Harold J. Berman, *Law and Revolution II, The Impact of the Protestant Reformation on the Western Legal Tradition*, 226-28, 306-29 (Harvard Univ. Press 2003); Blackstone, *Commentaries on the Laws of England, Book IV*, Chap. 29, 368-82 (Legal Classics Library Ed. 1983). The Sentencing Guidelines removed individualized sentencing by judges that had existed in Anglo-American law for more than three centuries.

two overriding principles stated above. The sentencing court should start with the guideline sentence corresponding to the guilty plea, take a look at how the guidelines would operate from that point and then engage in the weighing and explanatory process outlined above without feeling an obligation to reach a result consistent with the Commission's guideline structure or policies. After finding the beginning guideline sentence, it is up to the judge to act like a common law judge of old engaged in the same process that prevailed in the federal system after 1790 but before the failed, 20-year experiment in mandatory guideline sentencing.