**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0576n.06

Case No. 19-4000

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

AESHA JOHNSON,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)

**FILED**
Oct 08, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

---

BEFORE: SILER, SUTTON, and LARSEN, Circuit Judges.

SILER, Circuit Judge. Defendant Aesha Johnson (Johnson) was convicted of one count of conspiracy to commit wire fraud, multiple counts of wire fraud, and multiple counts of aggravated identity theft. She now alleges six instances of reversible error. We **AFFIRM**.

## FACTUAL AND PROCEDURAL HISTORY

In 2012, Johnson was convicted of filing false tax returns, for which she began serving a term of imprisonment. While incarcerated, Johnson began the fraudulent scheme forming the basis for her current convictions. Johnson engaged in a tax fraud scheme with her daughter, Brittany Williams (Williams), who served as Johnson's outside-of-prison contact.

After Johnson and Williams were indicted, Williams pleaded guilty to all 29 counts of the indictment. The grand jury then returned a superseding indictment against Johnson, charging her with one count of conspiracy to commit wire fraud, 14 counts of wire fraud, 14 counts of

aggravated identity theft, and one count of witness tampering. The trial jury found Johnson guilty on all charges, except the witness tampering charge, as the district court acquitted her on that charge. The district court sentenced Johnson to a term of 208 months' imprisonment plus $63,708 in restitution.

## DISCUSSION

Johnson alleges six errors, three at the trial phase and three at the sentencing phase. Each is taken in turn, and none requires reversal.

### I.    Trial Phase

#### a.    *Government's Use of Johnson's Co-Conspirator's Plea Agreement*

Johnson first alleges reversible error in the government's use of Williams's plea agreement against Johnson. Seemingly conceding that the use of a nontestifying co-conspirator's plea agreement against a defendant violates the Confrontation Clause,[1] the government instead argues that Johnson invited that error because she first used Williams's guilty plea as part of her defense and created a misperception about what the agreement stated.

Johnson admits that her defense strategy was to "argue[] that Brittany [Williams] was the actual perpetrator[,]" which is reflected in Johnson's assertions during trial suggesting that Williams, through her guilty plea, had either already taken sole responsibility for the crimes charged of Johnson or committed them alongside another individual, Marc Lanier (Lanier), only. Johnson first referenced Williams's guilty plea in her opening statement. Johnson also discussed Williams's guilty plea while cross-examining two of the government's witnesses. Following that testimony, the government moved to admit a copy of Williams's plea paperwork because "defense counsel mischaracterize[d] the crime to which [Williams] has pleaded guilty as her admitting to

---

[1] *See United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) ("The admission of the plea allocutions of [co-conspirators] violated defendants' Confrontation Clause rights.").

doing the taxes, when in fact the change of plea or the guilty plea in this case was to admitting to conspiring with . . . Aesha Johnson, to commit the crime." The district court permitted the introduction of Williams's plea paperwork into evidence, revealing that Williams pleaded guilty to conspiring to commit the charged crimes specifically with Johnson.

"The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993) (citations omitted). The application of the invited error doctrine in the case *sub judice* is almost indistinguishable from its application in *United States v. O'Reilly*, 469 F. App'x 441, 442 (6th Cir. 2012) (finding that invited error doctrine precluded review of allegation of error in admission of additional evidence of other robberies and murder-for-hire efforts referenced in the defendant's opening statement). Johnson cannot now complain of the admission into evidence of the very matter she first brought up and seemingly mischaracterized at her trial several times. *See United States v. Ramos*, 861 F.2d 461, 468–69 (6th Cir. 1988) ("[W]hen a party opens up a subject . . . [the party] cannot complain on appeal if the opposing party introduces evidence on the same subject." (citations omitted) (internal quotation marks omitted)).

b. *Relevance and Unfair Prejudice*

Johnson's second allegation of error is that the trial court admitted what Johnson calls irrelevant and unfairly prejudicial evidence. Specifically, Johnson takes issue with the following evidence that was admitted: (1) Williams's plea agreement and 2015 statements about the conspiracy; (2) text messages exchanged between Johnson and Williams in 2015; (3) witness testimony about Johnson's relationship and interactions with Williams while Williams was being

investigated in 2015 and 2016 for passing a counterfeit bill; and (4) "vanilla [credit] cards" found in Williams's car as a result of that 2015–2016 investigation.

Beginning with the introduction of Williams's plea agreement, Johnson made that evidence relevant by referencing Williams's guilty plea numerous times in her opening statement and examinations of witnesses. This is also why Johnson cannot now claim undue prejudice from the admission of the plea agreement—she put the plea agreement at issue.

As for Williams's statements made in 2015 about the conspiracy, these statements detailing the scheme charged against Johnson were relevant, regardless of whether they were made during or after the conspiracy. Additionally, Johnson has not identified any specific unfair prejudice stemming from the admission of these statements other than the inherent damage this evidence did to her case, which is an insufficient basis for exclusion under Fed. R. Evid. 403.

Regarding the remaining evidence, Johnson's arguments of irrelevancy and unfair prejudice appear to stem from a flawed premise. Specifically, regarding the 2015 text messages, Johnson argues "[p]ursuant to the indictment, the scope of the conspiracy here was from November 6, 2013 'through on or about April 15, 2014.' Therefore, any statements to further criminal acts occurring after this latter date are presumably not relevant to the jury's consideration of the charged offenses." However, a superseding indictment filed in her case sets out the relevant dates of the conspiracy as between January 1, 2013 and February 1, 2016, which overrides the dates on which she bases her arguments. Johnson's argument for the irrelevancy and unfair prejudice of the aforementioned evidence is based on Johnson's mistaken reliance on the time period set out by the original indictment, which was superseded.

Regarding the 2015 text messages exchanged between Williams and Johnson, the only specific messages Johnson takes issue with are two messages that she sent. Those text messages

were relevant because they potentially shed light on Johnson's role in articulating an untraceable way that she and Williams could either communicate about or further act in their scheme. Similarly, the vanilla credit cards, which were described as "blank cards[,]" were found among debit cards in Williams's car and were the type of card used to load funds from fraudulently obtained tax return proceeds as a part of the scheme. Finally, the witness who investigated Williams's counterfeit bill use described Johnson's relationship with Williams as Johnson "hovering" over Williams, "direct[ing] her[,]" and acting as the "gatekeeper" to Williams. Such testimony evidenced the dominant influence Johnson had over Williams in support of the government's assertion that Johnson was the mastermind behind the scheme at issue. Although these observations were made in 2015 and 2016, Johnson has not shown why it can be said that her tax fraud scheme ended before those dates. All of the aforementioned evidence was relevant to shed light on the relationship between Johnson and Williams and the details of their scheme.

> c.      *Testimony that Williams Spoke "Untruthfully" During Pretrial Interview*

Johnson's third allegation of error is that the district court improperly allowed a government witness, Agent Richard Kushan of the Internal Revenue Service, to testify that Williams spoke "untruthfully" during a pretrial interview.

Kushan conducted a "proffer" interview of Williams, which is "when somebody can come in and provide information to the government . . . and [the government] will not use that information against them directly in any type of investigation." During the proffer, Williams "claimed that she wasn't aware and didn't have very much knowledge of the scheme . . . [and] that an individual named Marc Lanier that [Johnson] knew was threatening her and that she needed to help pay off a debt that [Johnson] owed Mr. Lanier." At trial, the government asked Kushan whether he believed Williams's statements were truthful or untruthful "[b]ased upon [Kushan's]

knowledge learned during the course of the investigation." Kushan answered, "based on my knowledge in the course of the investigation, the statements that Ms. Williams made during that original proffer interview were untruthful."

Kushan then outlined specifically why he believed Williams's statements were untruthful:

A    She seemed kind of angry at times and argumentative when confronted with information about this tax scheme. The story also didn't really kind of add up or make much sense when we kind of compared it with what was in the jail calls and the e-mails.

Q    Okay. Now, you mentioned there was some indication that there was some sort of – a Marc Lanier that Brittany Williams put the blame on in this case. Did you conduct follow-up investigation involving looking into Mr. Lanier?

A    Yes, we looked up – we looked into Mr. Lanier.

Q    Was he alive or dead at the time?

A    He was currently deceased at that time.

Q    All right. Did you find anything in the jail calls or e-mails relating to a Mr. Lanier?

A    No, we did not.

Q    Did you find anything in the IP records?

A    No, we did not have any IP records that went back to Mr. Lanier.

Q    What about any addresses, related addresses?

A    No, not that I'm aware of, none of the addresses.

Q    For the tax years 2012 and '13 that are part of this conspiracy, did you find any bank records that related back to Mr. Lanier?

A    2012 and 2013, no, we did not.

Q    So based upon this subsequent investigation, did you learn whether this information was true or false?

A    We learned that the information provided was false.

Johnson's main argument here is that Kushan improperly vouched for or bolstered Williams's credibility by testifying that Williams was untruthful during her first proffer interview, insinuating that Williams was then truthful during a second proffer interview when she implicated Johnson in the scheme. This court in *United States v. Martinez*, 253 F.3d 251, 253–54 (6th Cir. 2001), dealt with a similar issue. As in *Martinez*, the prosecutor here never made any comments indicating a personal belief as to Williams's credibility; rather, the prosecutor elicited testimony

from Kushan regarding Williams's credibility. *Id*. at 254. Thus, the correct characterization of the issue here is whether the government engaged in improper bolstering, not vouching. *See id.* And in that vein, the government did not engage in improper bolstering because, unlike in *Martinez*, the government did not commit the fatal flaw of failing to "draw out" why Williams's statements were uncorroborated. *Id*. Instead, the prosecutor here engaged in a lengthy colloquy with Kushan, who outlined all of the reasons why Williams's statements in her first proffer were false, including the fact that Williams's story did not square with the incriminating jail calls and e-mails the government had and because there was no indication that Lanier was involved in the scheme. In sum, no improper vouching or bolstering occurred.

Johnson also appears to argue that the trial court plainly erred when allowing Kushan to testify as both an expert and fact witness. Although there is no indication from the record that Kushan was ever formally designated as an expert, "[w]hen an agent gives opinions that rely on the agent's specialized training as a law enforcement officer, that testimony is expert testimony, and the agent must be qualified under Rule 702." *United States v. Kilpatrick*, 798 F.3d 365, 384 (6th Cir. 2015) (citation omitted). That being said, "when an agent relies on his or her personal knowledge of a particular investigation, the agent's opinion may be lay opinion testimony under Rule 701." *Id*. (citations omitted). "[W]hen a witness gives both fact and expert testimony, the district court must give a cautionary jury instruction regarding the [witness's] dual witness roles or there must be a clear demarcation between [the witness's] fact testimony and expert opinion testimony." *United States v. Ham*, 628 F.3d 801, 806 (6th Cir. 2011) (citations omitted) (internal quotation marks omitted).

Even though there is no indication the district court gave a cautionary jury instruction here, "the line of demarcation between" Kushan's expert and fact witness testimony as it pertains to

Kushan's statement that Williams spoke untruthfully during her first proffer is "indisputably clear." *United States v. Martin*, 520 F.3d 656, 659 (6th Cir. 2008). When providing the basis for his belief in that regard, Kushan always provided fact-specific reasons and indicated that it was based on information gathered from the investigation, not any specialized expertise he possessed in his field.

Finally, a generous reading of Johnson's brief suggests that she has also cursorily argued that it was impermissible for Kushan to specifically make the comment that Williams was "untruthful" during her first proffer. On this point, however, Johnson has otherwise "le[ft] it to the court to seek out the relevant law, identify the relevant evidence, and develop [Johnson's] argument for [her]." *United States v. Bradley*, 917 F.3d 493, 509, 511 (6th Cir. 2019) (refusing to address potential issue of first impression "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (citations omitted) (internal quotation marks omitted)). Johnson has not articulated why it is improper for an interviewing officer to testify specifically that an interviewee lied during an outside-of-court interview. On that point, courts appear to permit lay witness testimony from an interviewing officer that a person "was not telling the truth" during a pretrial interview. *See, e.g.*, *United States v. Churchwell*, 807 F.3d 107, 118–19 (5th Cir. 2015).

In sum, the trial court did not err in allowing Kushan to testify that Williams was untruthful during a pretrial interview.

## II. Sentencing Phase

### a. Loss Calculation

Johnson's first allegation of error at the sentencing phase is that the district court erred in calculating loss in determining her sentence. *See generally* USSG § 2B1.1(b). Specifically,

Johnson's only argument on this point is that the district court considered certain factors it should not have in coming to the amount that it did. "[W]e review the district court's methodology for calculating loss *de novo*. An error with respect to the loss calculation is a procedural infirmity that typically requires remand." *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010) (citations omitted).

The district court found the total loss calculation in this case to be $285,445. Johnson argues that the district court should have calculated the total loss to be $63,708 after removal of three improper considerations: (1) figures from returns that either could not be or were not paid out; (2) Williams's admission that the total loss in the scheme was $282,922; and (3) figures from other tax returns that were not specifically identified as the basis for Johnson's convictions in this case. Johnson, however, provides no support for her assertion that these considerations were improper.

Johnson's assertion that the district court erred in utilizing refund amounts that were not actually paid out or that were impossible or improbable to pay out is directly refuted by the guidelines. In fraud cases, "[l]oss under [USSG § 2B1.1](b)(1) is defined as 'the greater of actual loss or intended loss.'" *United States v. Vance*, 956 F.3d 846, 860 (6th Cir. 2020) (quoting USSG § 2B1.1 cmt. n.3(A)). The district court correctly considered proceeds from filed tax returns Johnson intended to fraudulently obtain, regardless of whether those proceeds were paid out or were impossible to pay out. *See* USSG § 2B1.1 cmt. n.3(A)(ii) ("'Intended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ."). Johnson also provides no support for her assertion that a district court cannot consider a co-conspirator's admission as to a scheme's total loss in calculating total loss as it pertains to another co-conspirator. *Cf. United*

*States v. Germosen*, 139 F.3d 120, 129 (2d Cir. 1998) (finding that estimated loss amount provided by co-conspirators was properly considered by district court in arriving at its loss calculation).

Nor does Johnson provide any support for her assertion that the district court erred in considering figures from tax returns Johnson fraudulently filed that were not formally part of the conduct with which she was charged. *See United States v. Shannon*, 803 F.3d 778, 787 (6th Cir. 2015) ("'Conduct that is not formally charged . . . may enter into the determination of the applicable guideline sentencing range.' This 'relevant conduct' may be considered if it is 'part of the same course of conduct or common scheme or plan as the offense of conviction.'" (citations omitted)). Johnson has not refuted the fact that all of the tax returns introduced by the government against her to determine the total loss at her sentencing hearing were part of the same course of conduct as the scheme forming the basis for her convictions. *See United States v. Dyer*, 908 F.3d 995, 1005–06 (6th Cir. 2018) (favorably citing *United States v. Decker*, 370 F. App'x 671, 673, 675–76 (6th Cir. 2010), where this court affirmed the district court's consideration of, in computing total intended loss, loss amounts over defendant's six-year scheme, even though defendant was only indicted on conduct for three of those years).

Johnson does not refute the government's best evidence for its loss calculation here—the sum of all the fraudulently filed tax return figures the government could locate. *See United States v. Baker*, 501 F.3d 627, 629 (6th Cir. 2007) ("In reviewing individual Guidelines determinations, we accept the district court's factual findings unless clearly erroneous . . . ." (citing *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005))).

    b.      *Position of Trust*

Johnson's second allegation of error at the sentencing phase is that the trial court improperly applied USSG § 3B1.3, which provides a two-level sentence enhancement when "the

defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense . . . ." The district court applied the abuse-of-trust enhancement "because [of] the fact that [Johnson] prepared taxes and . . . held herself out to be a tax preparer."

Although Johnson seems to argue that a position of trust did not exist here, this court has found that a tax preparer holds a position of trust with his or her clients. *United States v. Sedore*, 512 F.3d 819, 825–26 (6th Cir. 2008). Johnson has not pointed to anything to call into question the evidence the government points to supporting its assertion that Johnson held herself out to be a tax preparer to the victims of her scheme.

c.       *Substantial Financial Hardship*

Johnson's final claim of error is that insufficient evidence existed to support the district court's finding that five victims suffered "substantial financial hardship" under USSG § 2B1.1(b)(2)(B) so as to apply a four-level sentence enhancement. "In reviewing a district court's application of the Sentencing Guidelines, this Court will 'accept the findings of fact of the district court unless they are clearly erroneous . . . ." *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (citations omitted). "We review a district court's legal conclusions regarding the Sentencing Guidelines *de novo*." *Id.* at 540 (citation omitted).

As Section 2B1.1(b)(2)(B) is a fairly recent addition to the Guidelines, Sixth Circuit precedent in its application is scarce, which is why the parties point to this court's unpublished decision in *United States v. Howder*, 748 F. App'x 637 (6th Cir. 2018). *Howder* provides the necessary guidance for the application of Section 2B1.1(b)(2)(B) in this case. *Id*. at 642–43; *see also United States v. Castaneda-Pozo*, 877 F.3d 1249, 1252–53 (11th Cir. 2017) ("[W]e find here that the district court did not clearly err by finding that victims suffered substantial financial

hardship when they were made insecure in life's basic necessities.").  Johnson does not refute the government's assertion that five individuals under whose names she filed fraudulent tax returns either lost or were at great risk of losing, at least temporarily, vital government assistance because of Johnson's actions.

**CONCLUSION**

Finding no merit in Johnson's allegations of reversible error, we **AFFIRM** the judgment.